UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
PATRIZIA CARUSO,

                Plaintiff,

                                    AMENDED COMPLAINT

                                    14 Civ. 4447 (VB)

        -against-

BON SECOURS CHARITY HEALTH SYSTEM INC.,
GOOD SAMARITAN REGIONAL MEDICAL CENTER,
1199 SEIU UNITED HEALTHCARE WORKERS EAST,
MORRISON HEALTHCARE SERVICES INC.,
ROGER A. FRANCO, DEREK JASON, AND            *ECF CASE*
CHARLES EDWARDS,

                Defendants.
-----------------------------------------------------------------
        Plaintiff PATRIZIA CARUSO, through the undersigned counsel MICHAEL D.

DIEDERICH, JR., complains of the Defendants as follows:

## Prefatory Statement

        Thus, this is an action for damages and injunctive relief against defendant Good
Samaritan Regional Medical Center, its parent Bon Secours Charity Health System Inc., and
its Human Resources Director, Roger A. Franco, for the discriminatory termination of
Plaintiff's employment, and conspiring to justify their actions after Plaintiff suffered a
vicious gender-biased physical assault by Charles Edwards (*Title VII & 42 U.S.C. §§ 1981 &
1985*); against Plaintiff's union for its discriminatory refusal to the remedy of a grievance
arbitration, which could and undoubtedly would have restored Plaintiff to the job in which
she had been employed during the prior 27 years (*Id.*); against Derek Jason for, *inter alia*,
conspiring to deprive Plaintiff of her civil rights (*42 U.S.C. §1985* ) and defaming her; and
against Charles Edwards for brutally beating Plaintiff (*common law battery & 42 U.S.C. §
1985*), and defaming her to rationalize his battery upon her.

        Charles Edwards, a young Afro-American man and amateur boxer, sexually and
racially harassed Plaintiff, a 48 year old Caucasian woman of Italian national origin. Plaintiff
complained to GSH's HR Director, Mr. Franco (Afro-American), to no avail.  This allowed
for Mr. Edwards' subsequent vilely obscene verbal harassment of Plaintiff, followed by his
brutally beating Plaintiff, in Mr. Jason's presence and with his acquiescence and inaction.
Plaintiff's union representative (Afro-American) did nothing to aid Plaintiff regarding her
collectively bargained contractual rights after GSH terminated both Edwards' and Plaintiff's
employment.

        Thus, race and gender discrimination motivated the individuals involved in the
decision-making—all Afro-American men.

## THE PARTIES

1.   Plaintiff Patrizia Caruso  is, and was at all times relevant herein, a citizen of the United States of America, residing in the Village of Airmont, Town of Ramapo, County of Rockland, State of New York.

2.   Defendant Bon Secours Charity Health System Inc. (hereinafter "Bon Secours"), upon information and belief,  is and at all times relevant herein was a business corporation organized and existing under the laws of the State of New York, with  local offices located at 255 Lafayette Avenue (Route 59), Suffern, New York 10901, in Rockland County.

3.   Defendant Good Samaritan Regional Medical Center (hereinafter "GSH") is located at 255 Lafayette Ave., Suffern, New York 10901, and, upon information and belief, is a subsidiary organization or department of, and is operated by, Bon Secours.  GSH and Bon Secours will be referred to collectively as the "Hospital Defendants."

4.   Defendant Roger A. Franco (hereinafter "HR Director Franco") is the Director of Human Resources at GSH and, upon information and belief, is a resident of the County of Rockland, State of New York.

5.   Defendant 1199 SEIU United Healthcare Workers East (hereinafter "1199 Union") is a labor organization and collective bargaining unit at GSH, upon information and belief, with headquarters at 310 West 43rd Street, New York, NY 10036, and is an affiliate of the Service Employees International Union.

6.   Defendant Morrison Healthcare Services Inc. (hereinafter "Morrison Services") is a contractor of GSH and, upon information and belief, has offices at 5801 Peachtree Dunwoody Road, Atlanta, GA 30342 and is a subsidiary of the Compass Group.

7.   Defendant Derek Jason (hereinafter "Mr. Jason") is, upon information and belief, a resident of the City of Newburgh, County of Orange, and State of New York.

8.   Defendant Charles P. Edwards (hereinafter "Mr. Edwards") is, upon information and belief, a resident of the Town of Ramapo, County of Rockland, and State of New York, residing at 27 Fletcher Road, Apt. F, Monsey, New York.

9.   Defendants GSH and/or Bon Secours is an employer within the meaning of 42 U.S.C. § 2000e-(b).

## JURISDICTION AND VENUE ALLEGATIONS

10. This court has jurisdiction over this action under 42 U.S.C. § 2000e-5(f), 42 U.S.C. §§ 1981 & 1985, and under 28 U.S.C. § 1331 and § 1343(4).

11. Venue is proper in this Court.

## FACTUAL ALLEGATIONS

Overview

12. Plaintiff is a Caucasian woman, 49 years of age, whose national origin is Italy. She is a naturalized citizen of the United States of America.

13. Despite performing admirably for the hospital for twenty-seven years, Plaintiff was suspended and terminated from her employment after suffering ongoing sexual harassment by a co-worker, Mr. Charles Edwards in 2012 and 2013, followed by his unprovoked and highly aggressive and vilely offense verbal attack on June 25, 2013, followed shortly thereafter by his vicious physical beating of Plaintiff. The physical assault resulted in Plaintiff being brought to the Emergency Room of Good Samaritan Hospital, with injuries which included brain injury. The Rockland County District Attorney's Office prosecuted Mr. Edwards for felony assault, and in July 2014, Mr. Edwards pled guilty to attempted assault, an E felony. He was sentenced to probation. He was not required to serve any jail time, pay any fine, or reimburse Plaintiff for any of her damages or otherwise pay restitution or reparations. His sentence was probation.

14. All of the decision-makers regarding Plaintiff's termination, and the individuals who provided input regarding the events in question, namely, HR Director Franko, 1199 Union Representative Patrick Forde, Mr. Edwards and Mr. Jason, are male Afro-Americans.

15. Upon information and belief, it defies logic, and contradicts human nature, for an impartial person to reasonably believe that a mild-mannered middle-aged woman would initiate a physical fight with a strong, 28 year old man, known to her and others to be an amateur boxer.

16. Yet GSH, the employer, through its Director of Human Resources (Mr. Franco), and the Union (through Union Representative Mr. Forde), decided to take the word of two young Afro-American men (one the assailant, and both with an ax to grind—Messrs. Edwards and Jason) that Plaintiff had initiated a fight after she had been vilely abused verbally by the assailant. Before the day of the assault, Mr. Edwards had sexually and racially harassed Plaintiff, with GSH providing no remedy or no protection to Plaintiff after she complained to HR Director Franco.

17. Plaintiff's immediate supervisor, Theresa DeFrancisco, has for 27 years known Plaintiff to be an excellent worker, and always a considerate and peaceful person.  Plaintiff's other co-workers, including Afro-Americans, viewed her likewise.

18. GSH had no reasonable basis to believe the word of non-disinterested individuals (Messrs. Edwards and Jason) to the contrary.

19. Plaintiff was beaten so badly that she had injury to her brain and spine.

Employment with Good Samaritan Hospital

20. Plaintiff began working in the Food Services Department at Good Samaritan Hospital (GSH) in 1986.

21. Plaintiff continued to work at GSH for approximately 27 years, until her employment was terminated after being physically beaten by Defendant Edwards in GSH during her work shift.

22. During her entire time working for Defendant GSH, Plaintiff was an exemplary employee.

23. In fact, Plaintiff had been given quasi-supervisory duties, and with these duties, helped ensure that food was properly distributed to patients at GSH.  This included ensuring that patients with allergies were safeguarded against food to which the patient was allergic.

24. Plaintiff's job was also to correct errors in the handling and distribution of food.  In this role, she pointed out and/or corrected potentially dangerous errors made by both Defendant Edwards and his friend, Defendant Derek Jason.

25. Plaintiff pointed out these errors in order to safeguard GSH patients.

26. GSH management should have recognized this as a motive for Mr. Edwards and Mr. Jason to dislike Plaintiff, and motive to lie about the events of June 25, 2013.

Mr. Caruso's complaints of sexual harassment

27. Prior to the June 25, 2013 incident and brutal assault, Plaintiff had complained of sexual harassment by Mr. Edwards, a young Afro-American male.

28. Plaintiff complained to her superiors at Good Samaritan Hospital.

29.  Plaintiff also complained to the food services company that had a role in supervising GSH employees, namely, Defendant Morrison Healthcare Food Services Inc. ("Morrison Services").

30a. Mr. Edwards was hired on or around July 11, 2011. Plaintiff was assigned to train him, as she had trained other new food service workers.

30b. After Mr. Edwards began working with Plaintiff, he started to sexually harass and make sexual advances towards Plaintiff.

30c. This was after Plaintiff had attempted to be kind and considerate, as a co-worker, by driving him home occasions when he needed a ride home because he had no automobile.

30d. Specifically, for several months during the winter of 2012-13, Mr. Edwards repeatedly told Plaintiff she was beautiful, asked her to go out with him, and said that he was handsome and could satisfy her. Several times when they were alone, he tried to touch and kiss her.

30e. On several other occasions, some of Plaintiff's coworkers would ask for a ride home, which she gave. Plaintiff also agreed to give Mr. Edwards a ride home. When she did, and to her astonishment, Mr. Edwards asked if Plaintiff wanted to go out with him and stated that he could please me much more than my husband could. Plaintiff responded by saying that she was uncomfortable with the conversation, at which point he expressed an apology.

30f. In or around December 2012, Plaintiff and Mr. Edwards were alone in the elevator, at which time Mr. Edwards touched Plaintiff , and tried to kiss her. Plaintiff pushed him away and told him to stop.

30g. Each of Mr. Edwards's sexual advances toward Plaintiff was unwelcome, and on each occasion Plaintiff asked him to stop, telling him that she was married and that his advances were inappropriate.

30h. Plaintiff reported the sexual harassment to her manager, Matt Kriwsky, who, in turn, told Plaintiff to "work things out." Plaintiff informed him that she had already tried and that it's not working. The next day Plaintiff went back to Mr. Kriwsky, and they then went together to the HR Department.

Mr. Edwards constantly "plays the race card"—a form of racial hostility

31a. After Mr. Edwards was hired, Plaintiff was tasked with training him. She began to show him what to do, but he expressed a superiority attitude. He complained to Plaintiff's

manager, Allison Sullivan, that Plaintiff was "rude" toward him and called him "stupid."  When Plaintiff confronted him about this, he admitted that Plaintiff did not call him any such name. Allison advised Plaintiff to be careful about how she phrases things to Mr. Edwards.

31b.  During the two weeks that GSH had Plaintiff training Mr. Edwards, he would talk down to her.  Plaintiff would explain to Mr. Edwards, regarding possible misunderstandings, that she was not born in the United State and that her "English isn't great."  Mr. Edwards would act superior to her, and say that things like "I have a degree, I know how to communicate." Mr. Edwards did not like to be told what to do even though Plaintiff was in charge of training new employees.  Plaintiff took her job very seriously, and job GSH tasked her to do included correct a trainee if he was not doing things correctly.  Mr. Edwards did not respond well to being corrected.

31c.  On several occasions, after Mr. Edwards's initial training, Plaintiff would hear him speak inappropriately in the workplace.  For example, he told coworker Jadfrey Clay that he (Edwards) was the most handsome man in the department. Mr. Edwards then proceeded to ask Plaintiff if she thought he was better looking than another coworker.

31e.  On other occasions, beginning in January 2012, when Plaintiff would appropriately correct Mr. Edwards in what he was doing at work, he would say "You're saying this because I'm Black."

31f.  On or around February 6, 2013, Mr. Edwards asked Plaintiff if she could wrap some silverware for him, and after Plaintiff did this, he took some silverware from Plaintiff's silverware box.  Plaintiff confronted him about this and he responded "You're accusing me of stealing because I'm Black."  Two GSH supervisors were present at the time and heard Mr. Edwards make this racist accusation.

31g.  On another occasion, Plaintiff was on a line where  people were waiting to fill cups of hot water and coffee at the coffee machine.  Mr. Edwards cut in front of her and Plaintiff said, "I was here first, please wait your turn," to which Mr. Edwards responded in a very loud voice "I'm not your child, don't disrespect me!"

<u>Plaintiff complains to GSH's HR Department</u>

31h.  In early 2013, Plaintiff complained to GSH's HR Department about Mr. Edwards.

31i.  As mentioned above, Plaintiff first complained to her manager, Matt Kriwsky.  Mr. Kriwsky took Plaintiff to Human Resources on or around February 6, 2013.  HR Director  Roger Franco and Plaintiff spoke about the above-referenced incidents involving Mr. Edwards.  Plaintiff explained that her major concerns were 1) sexual harassment and 2) being accused of being racist.  Mr. Kriwsky and HR Director Franco said they would get back to Plaintiff after they made a decision.

31j.  Specifically, Plaintiff informed HR Director Franco that Mr. Edwards was sexually harassing her, and that he was also harassing her by accusing her of being a racist.  She explained to HR Director Franco that almost every time Charles says something to Plaintiff he refers to the fact that he is Afro-American, even though the conversation had to do with hospital business, not the color of his skin.  Plaintiff informed HR Director Franco about the repeated sexual harassment, and that Mr. Edwards physically touched her and tried to kiss her, and asked her to go out with him.  HR Director Franco said he had to investigate to make his decision and that he would inform Plaintiff of his decision.

31k.  About one week later, Plaintiff met union delegate Charlotte Savoury in front of HR Director Franco's office.  As Ms. Savoury had been directed to be there, she was undoubtedly fully aware of Plaintiff's sex and race harassment complaints to the HR Department.

31 l. Ms. Savoury, HR Director Franco, Mr. Edwards and Plaintiff then all met inside the HR Department.   HR Director Franco there informed everyone that Mr. Edwards would move from the kitchen department to another department within the hospital.  Furthermore, HR Director Franco informed Plaintiff that if she continued to pursue this issue, it would ruin Mr. Edwards' opportunity for such a move.

31m.  HR Director Franco seemed to be siding with Mr. Edwards.   HR Director Franco said he spoke to Mr. Edwards and that Mr. Edwards was sorry and gave assurance that he would change his behavior.

31n.  HR Director Franco then said that Mr. Edwards put in a request to be transferred to another department and that if Plaintiff pursued her complaints, it would ruin this opportunity for him and that he was confident that Mr. Edwards and Plaintiff "will respect one another."

31o.  Plaintiff felt as if she had been provided with no remedy whatsoever.

31p.  In her 27 years working at GSH, many of Plaintiff's coworkers have been African Americans, and she has gotten along with all of them, with no complaints at all, and none involving race.

Plaintiff complains to other managers about Edwards' sex and race harassment

30. Omitted.

31. Omitted.

32. Omitted.

33. Plaintiff complained about Mr. Edwards' repeated sexual and racial harassment and related threatening conduct to other supervisors or managers.  She complained to her supervisors, Theresa DeFrancisco and Sandra Gonzales, employees of Morrison Services and/or GSH.  In sum, after the follow-up meeting with Mr. Franco (with Mr. Edwards and a union delegate), Plaintiff was pressed not to pursue the complaint against Mr. Edwards, as Plaintiff was told by Director Franco that a complaint by her would ruin Mr. Edwards' opportunity for a transfer.

34. At this point in time, Plaintiff feared reprisal and was concerned for her own safety. She also recognized that Mr. Franco was Afro-American, and because of this, was likely siding with Mr. Edwards, who was also Afro-American, by stating that this would "ruin Mr. Edwards' opportunity for a transfer."  Plaintiff understood this to be an implied message from Mr. Franco that he did not wish to take adverse job action against Mr. Edwards on Plaintiff's complaint of sexual harassment.

35. Director Franco gave Plaintiff the impression that Mr. Edwards would not be moving anytime soon, and gave the impression that he was not serious about taking any necessary corrective action.  Mr. Franco appeared biased in favor of fellow Afro-American Edwards, and against Plaintiff, a female Caucasian.

36. Plaintiff was so upset that Mr. Franco was not taking prompt action, and not taking her complaint seriously, that she refused to shake Mr. Franco's hand upon departing his office.

37. From Plaintiff's perspective, Mr. Franco was not doing what was necessary to protect her, but instead was keeping her in a perilous, hostile and potentially dangerous workplace.

38. Plaintiff's fears continued, as Mr. Edward was not transferred.

39. Thus, Plaintiff was forced to continue working in a racial and gender-hostile work environment.

Failure of GSH or Morrison Services to investigate Mr. Edwards

40. Upon information and belief, if Director Franco or Morrison Services had investigated Mr. Edwards, they would have learned that his offensive behaviors were open and notorious.

41. Upon information and belief, they would have learned that Mr. Edwards was an assaultive person, and an amateur boxer, who provoked, challenged and then fought with at least one GSH co-worker in the GSH parking lot.

42. Neither GSH nor Morrison Services took adequate remedial measures regarding Mr. Edwards' sexually harassing, assaultive and otherwise threatening conduct. Neither took necessary or adequate measures to discipline Mr. Edwards, or to prospectively restrain or prevent him from engaging in improper, offensive or assaultive workplace conduct.

43. In its failure to investigate and take appropriate action, and for its own profit-making purposes without regard to the threat Mr. Edwards posed to his co-workers, GSH and Morrison Services aided and abetted Mr. Edwards' harassing, assaultive and discriminatory behavior, by keeping him employed at GSH at the same location as Plaintiff.

44. In its supervisory role, Morrison Services owed a duty of care toward the GSH employees that it hired or supervised, including Plaintiff. Its failure to protect Plaintiff amounted to gross negligence on its part.

45. Upon information and belief, GSH also owed a duty of care toward its employees, including Plaintiff, and its failure to protect Plaintiff also amounted to gross negligence on its part.

Proper food handling

46. As mentioned above, Plaintiff was also a senior food service worker, and had been given duties to ensure the proper distribution of non-allergenic food to patients.

47. In this capacity, she had to correct the mistakes of both Defendant Edwards and Defendant Jason, which mistakes imperiled patient safety.

48. Upon information and belief, in part because of her corrective action toward them, and reporting their food service handling mistakes to the supervisor, both Edwards and Jason held race-based animus toward Plaintiff, as a foreign-born "white" woman who had the audacity to criticize their job performance as food service workers.

49. Upon information and belief, Plaintiff's actions in insuring proper food delivery to patients contributed to the hatred and total lack of respect shown by Mr. Edwards toward Plaintiff on June 25, 2013, and Mr. Jason's willingness to seek to provide an exonerating, or at least a mitigating, explanation for Mr. Edward's actions in brutally beating Plaintiff, discussed next.

Mr. Edwards' vicious assault upon Plaintiff—June 25, 2013

50. On June 25, 2013, Plaintiff was one of several employees washing dishes towards the end of a kitchen shift.

51. Mr. Edwards entered the room, demanding that someone give him silverware.

52. When no one responded to him, Mr. Edwards once again demanded clean silverware. He stated that since he was working as a catering associate for that shift, he would not wash dishes.

53. Among a catering associates' duties are bringing meals to patients and wrapping clean silverware at the end of a shift, so that it is ready for distribution by those working the following shift.

54. Plaintiff was working as a utility worker during this shift. A utility worker's duties include cleaning the kitchen and washing dishes.

55. Plaintiff told Mr. Edwards that the silverware was not yet clean, and that he should talk to the supervisor, Theresa DeFrancesco, if he wanted silverware immediately.

56. Mr. Edwards came over to Plaintiff, leaned close to Plaintiff's face, and called her a "whore" and told her "Do not disrespect me!"

57. Mr. Edwards continued yelling at Plaintiff, who became very frightened of Mr. Edwards. Edwards continued using offensive language, uttering words in sum and substance:

"'What are you gonna do?

"You gonna spit at me?"

"You gonna intimidate me?"

58. Another employee, Primitivo ("Jimmy") Silveira, pulled Mr. Edwards away from Plaintiff.

59. Other employees present were Carmela Ungaro and Rose Marie Waitszies.

60. The food service supervisor, Ms. DeFrancesco, then entered the room and told everyone to calm down. However, she did not direct Mr. Edwards to remove himself from the

area.

61. Mr. Edwards left the room.  He then came back for a second time, and came up to Plaintiff's face.  Plaintiff's co-worker had to pull Mr. Edwards away.  Plaintiff's physical safety was threatened.  Mr. Edwards then walked toward the nutrition room, while screaming profanities at Plaintiff including:

> "Suck my dick, you fucking whore! Tell your husband to suck my dick!
> Tell your kids to suck my dick!"

62. Ms. DeFrancesco, perhaps afraid of Mr. Edwards herself, perhaps realizing that the Hospital Defendants and Mr. Franco did nothing to protect Plaintiff at this time, even though presumably knowing of Plaintiff's earlier complaint of sex and race harassment.  Perhaps believing it best to let everyone calm down, Ms. DeFrancesco did nothing.

63. Because Plaintiff's supervisor had done nothing (and the hospital nothing after her complaint of sexual harassment against Mr. Edwards), and facing an objectively intolerable and horrific work environment with no protection being offered whatsoever by GSH or its management, Plaintiff decided that she should try to directly ascertain from Mr. Edwards why he was so angry and yelling into Plaintiff's face such vile and obscene language at her.

64. Plaintiff therefore went into the nutrition room (where the wrapped silverware was kept) to ask Mr. Edwards why he was saying the things he was saying and to ask why he was so angry and acting as he was.

65. Plaintiff tried to touch his shoulder to get his attention (as he was talking to Mr. Jason), but before she could speak to him, Mr. Edwards turned around and knocked her down onto the floor with his fists, where he then continued to brutally punch Plaintiff about the head, face and both sides of her upper body, beating her into unconsciousness.  *See*, Exhibit "3" (photographs of Plaintiff after the beating).

65a.  Mr. Jason was present, and stood by doing absolutely nothing to help Plaintiff as she lay on the floor being beaten.

66. Mr. Edwards is a strong young man, who trains as a boxer, and is much larger and stronger than Plaintiff, a middle-aged woman approximately twenty years older than Edwards.

67. Plaintiff's injuries included damage to her brain—a concussion, scalp hematoma, subarachnoid hemorrhage on both sides—and injury to her spine (disc herniation), as well as significant psychological injuries including nightmares, severe anxiety, and Post Traumatic

Stress Disorder ("PTSD").

68. As mentioned above, the Rockland County District Attorney's Office prosecuted a felony assault charge against Mr. Edwards.

69. The plea deal was to an E felony and probation, with no fine or jail.  It was reached with no meaningful input from Plaintiff or input from the various witnesses who observed the events of June 25, 2013 (other than assailant Edwards and his friend, Mr. Jason).

<u>Termination while on sick leave, recovering from the assault</u>

70. On or about July 3, 2013, while out sick due to her injuries, Plaintiff was informed by her union, Defendant 1199 Union, that she had been suspended without pay.

71. Plaintiff and Mr. Forde (Afro-American) met with Mr. Franco around July 9, 2013, where Mr. Forde did not advocate for Plaintiff in any meaningful way, and it appeared instead that he was defending Mr. Edwards at Plaintiff's expense.

72. During this meeting, Plaintiff was still recovering from the beating she had suffered at the hands of Mr. Edwards.

73. Upon information and belief, Mr. Franco could clearly see that Plaintiff was not being properly served by her union representative, as Plaintiff, the victim, was being viewed instead by Mr. Forde as if she were a perpetrator.  Upon information and belief, it should have been clear to Mr. Franco that Mr. Forde was deeming the malfeasant Mr. Edwards as having an excuse and justification for his misconduct--his vicious verbal and physical assaults upon Plaintiff.

74. Thereafter, around July 19, 2013, Plaintiff was informed that her employment at GSH was terminated.

75. Plaintiff was not paid any of her accrued vacation time nor her accrued sick leave.

76. Plaintiff's union did not discuss the situation with her, nor advocate for her in any substantial way.  Mr. Edwards was a member of the same 1199 Union. Upon information and belief, his determinations (if any) were based solely upon the incredulous testimony of Mr. Edwards and Mr. Jason that Plaintiff was somehow at fault in causing the physical violence that befell her.[1]

77. Upon information and belief, no conduct or actions by Plaintiff, under the known

---

[1]  Plaintiff believes that it was well known, or could have been easily ascertained by the hospital Defendants, that Mr. Jason is the cousin of Mr. Edwards' domestic partner.

facts, could justify the Hospital Defendants in viewing Plaintiff as anything other than a victim of physical violence.

78. The police report of the incident indicates that Mr. Edwards suffered no physical injury whatsoever.

HR Director Franco's bias and conflict of interest, & GSH reprisal

79. Good Samaritan Hospital knew, at the time it terminated Plaintiff, that HR Director Franco could not be an unbiased evaluator of the events of June 25th, as Mr. Franco's inaction and disregard for Plaintiff's safety and welfare resulted in her being brutally attacked and caused severe physical injury.

80. As to Mr. Edwards' propensity for violence, upon information and belief, he has had several shouting matches with colleagues at GSH.  At GSH, he has at times challenged people to fight with him.

81. On at least one occasion Mr. Edwards physically fought (boxed) another GSH employee in the hospital parking lot, after challenging the co-worker.

82. Mr. Franco, by ignoring Plaintiff's prior plea that she be permitted a safe and non-hostile work environment, aided and abetted Mr. Edwards' continuing and escalating misconduct and abusive actions.

83. Upon information and belief, GSH and Mr. Franco used workplace violence as a pretext for unlawfully terminating Plaintiff's employment, for their own self-interested purposes, including but not limited to:

> Avoiding criticism that GSH had done nothing about sexual harassment in its workplace, by taking no action regarding Mr. Edwards until his felonious physical assault upon Plaintiff;

> Avoiding paying Workers' Compensation for Plaintiff's serious physical and psychological injuries;

> Avoiding potential bad publicity that GSH had created a work environment wherein a 28 year old amateur boxer could beat up a white middle-aged female coworker in the hospital; and

> Avoiding any appearance of race discrimination, by taking action against not only against Mr. Edwards (an Afro-American), but also the innocent Plaintiff (Caucasian/Italian national origin).

84. Upon information and belief, because Plaintiff previously complained about Mr. Edwards, GSH and Mr. Franco had the above-described reasons to act unreasonably against and

retaliate against Plaintiff. They retaliated and acted with manifest unfairness in pursuit of their own self-interest.

85. By permitting and condoning Mr. Edwards' discrimination and sexual harassment toward Plaintiff, and doing nothing to stop it, Plaintiff was discriminated against by Mr. Franco and the Hospital Defendants on account of her gender, her national origin, her age and her race.

GSH did not contest Plaintiff's unemployment insurance application

86. Upon information and belief, GSH and Mr. Franco did not report Plaintiff as having committed misconduct to the N.Y.S. Department of Labor's Unemployment Insurance office.

87. Upon information and belief, Franco did not report Plaintiff as having committed misconduct because Mr. Franco knew Plaintiff was a victim, not a perpetrator, and that she had likely engaged in no misconduct whatsoever.

88. Upon information and belief, Mr. Franco and GSH were afraid that an unemployment insurance hearing would reveal Plaintiff to be the completely innocent victim of gender violence in the workplace.

89. In contrast, upon information and belief it is Mr. Franco had engaged in employment misconduct, by intentionally failing to protect Plaintiff and instead vilifying her as an assaultive worker. He did this in order to avoid responsibility for his own dereliction regarding Plaintiff's report of sexual harassment, and as a result of his own bias in favor of an Afro-American male, Mr. Edwards.

Union conflict of interest & collusion to violate civil rights

90. Afterward the assault, Plaintiff was told by her union delegate, Patrick Forde (Afro-American), of the 1199 SEIU, that he would be "fighting for both of us" (namely, assailant Edwards and Plaintiff).

91. Plaintiff does not see how, or why, her Union could support her assailant, Mr. Edwards, and also advocate for her, the victim of the assault.

92. Rather, it appears that Plaintiff's union delegate, Mr. Forde, and the HR Director, Mr. Franco, colluded and conspired to make it appear that their fellow Afro-American, Mr. Edwards, was less culpable than he actually was, because his assault was entirely unprovoked by Plaintiff.

93. Notwithstanding what Mr. Forde stated in Plaintiff, in actuality he took no effort whatsoever to "fight for" Plaintiff, as the Union did not even pursue a grievance arbitration to

seek her job back.

93a.  In particular, the Union discriminatorily refused to allow Plaintiff to pursue a grievance.  The Union could have permitted BOTH Edwards and Plaintiff to go to arbitration, and in so doing allow a neutral arbitrator to determine whether either (or both) committed misconduct, and if so, whether the misconduct was sufficient "just cause" to warrant termination of employment.

93b. The Union obviously knew that Edwards (charged with a felony) could not avoid termination.  The Union could not, however, reasonably view Plaintiff in the same light, as a 27 year employee viciously beaten by her Afro-American co-worker, Edwards.

93c.  The Union reasonably knew that an arbitrator likely would have restored Plaintiff's employment.

93d. Yet the Union discriminatorily decided to treat (much older, Caucasian) Plaintiff Caruso as culpable, even though she had previously been victimized by Edwards' sexual harassment, and treated Caruso as equally culpable as the (much younger, Afro-American) Edwards.

93e.  A reasonable jury can reasonably infer that the Union's decision-making was unlawfully discriminatory when it viewed a Caucasian female victim of repeated sexual harassment and a vicious assault in the same manner (denial a grievance arbitration) as it treated an indisputably violent Afro-American man.

93f.  The Union could have afforded both Edwards and an arbitration hearing, and it certainly should not have denied Plaintiff the opportunity to have her employment restored through arbitration.

93g.  Upon information and belief, the Union allows arbitration of grievances of individuals whose alleged misconduct was far worse than Plaintiff's alleged misconduct.  The Union thereby denied Plaintiff, as a bargaining unit member, the protection of the collective bargaining agreement ("CBA") requiring just cause for termination.  This violated its duty of fair representation, in a wholly discriminatory manner.

93h.  Moreover, the Union took a position "adverse to" Plaintiff, as a grievent, by denying her the remedies available to Plaintiff through the arbitration process, namely, the opportunity to show that her actions did not amount to "just cause" sufficient to warrant termination of her employment

93i.   Plaintiff did not need anyone from the Union to "advocate" for her.  All she needed was for the Union to allow the matter to proceed to an arbitration hearing.

93j.  The Union's adverse treatment of Plaintiff was obviously intentional, including but not limited to ignoring Plaintiff's description of the severe discriminatory treatment she experienced in her employment at GSH.  This included the sexual harassment before day of the assault; the gender harassment (Edwards' vile, disgusting language) immediately preceding the assault; and the termination of Plaintiff's employment resulting from her assault.

93k.  The Union's adverse treatment of Plaintiff was severe, for the reasons stated above, and also because the Union denied Plaintiff the collectively bargained means of restoring her employment when there was not sufficient "just cause" for termination—an arbitration hearing.

93l.  Finally, the Union's adverse treatment of Plaintiff was unrelated to legitimate union objectives.

93m.  Granting Plaintiff the ability to vindicate herself at arbitration would have served legitimate union objectives.  Depriving Plaintiff of the ability to obtain her job back through arbitration–where it is indisputable that the Union was aware that she was the victim of brutal, gender and race-biased violence-- served no legitimate union objective.

94. 93n.  Upon information and belief, the June 25th assault by Mr. Edwards upon Plaintiff was investigated by HR Director Franco, who related some or all of his investigation to Mr. Forde.  They both ignored the evidence of Mr. Edwards' abusive history, his sexual harassment of Plaintiff, his aggravated harassment toward Plaintiff immediately before his physical assault upon Plaintiff, and his brutal physical assault upon her, in deciding to terminate Plaintiff's employment and deny her a grievance arbitration.  Mr. Forde's and the Union's actions and inactions were the result of gender, national origin and racial bias.

95. Upon information and belief, Plaintiff was replaced by a new employee, an Afro-American, to perform some of her former duties, and that a much younger 25 year old Caucasian American-born co-worker was assigned some of Plaintiff's other duties.

Summary

96. Plaintiff has no history of violence or physically aggressive conduct in the workplace, and there was no plausible basis for GSH or Morrison Services to conclude that she committed any wrongdoing whatsoever on June 25, 2013.

97. Plaintiff's only role in the violent altercation with Mr. Edwards on June 25, 2013 was

as a victim. She had previously sought protection from Mr. Edwards' confrontational demeanor and sexual harassment, but was denied such protection by GSH and Morrison Services. This was notwithstanding the fact that Mr. Edwards' sexually harassing, aggressive and confrontational actions and demeanor towards his female co-workers were widely known by Good Samaritan Hospital and Morrison Services personnel and officials.

98. Plaintiff was the victim of a hostile work environment, condoned by GSH, Morrison Services, and the 1199 Union, and Plaintiff then the victim of a brutal assault in this environment.

99. To terminate the employment of this peaceful, 27 year employee was not only unjustified and pretextual, but outrageous. GSH has made Plaintiff a victim psychologically (by allowing a continuing hostile work environment, with no intervention, culminated in vicious verbal insults), physically (by allowing a brutal physical battery), in her employment and career (by being fired for misconduct), financially (being unable to find comparable new employment, being denied her accrued vacation pay and sick time, and being denied workers' compensation benefits), and interference with her relationships with co-workers, friends, family and husband.

100. Plaintiff was the victim of discrimination and reprisal. The termination of her employment was without any just cause. The employment termination was manifestly discriminatory and retaliatory.

Breach of Contract Claim for Breach of Duty of Good Faith and Fair Dealing

101. Upon information and belief, the Hospital Defendants breached the implied covenants of good faith and fair dealing when terminating Plaintiff's employment under the circumstances of this case.

Damages

102. Plaintiff lost her job, and became unemployed. Her lost back pay and front pay are estimated to be over $100,000.

103. She incurred the costs of a maliciously prosecuted criminal defense of over approximately $7,500.

104. Plaintiff lost accrued sick time in the accumulated sum of approximately 972 hours, which at Plaintiff's hourly rate ($17.35 per hour) represents damages of $16,871. Plaintiff lost accrued vacation time in the accumulated amount of approximately 142 hours, which at

Plaintiff's hourly rate ($17.35 per hour) represents damages of $2,470.  Plaintiff lost accrued personal and holiday days in the accumulated sum of 22.5 hours, which at Plaintiff's hourly rate ($17.35 per hour) represents damages of $390.  Thus, Plaintiff's total unpaid time accruals amount to approximately $19,630. Plaintiff suffered a brutal beating resulting in brain and spinal injury, and emotional and psychic injuries including PTSD.  Her emotional and psychological damages alone should be valued at well over $1 million.

EEOC "Right to Sue" Letter

106.    Plaintiff has filed a timely charge of race discrimination with the Equal Employment Opportunity Commission and brings this action within ninety (90) days of the receipt of a Notice of Right To Sue,  upon charges numbers 520-2014-01098 and 520-2014-01104, issued by the EEOC by letters dated June 12, 2014, copies of which are attached hereto as Exhibits "1" and "2".

### FIRST CLAIM FOR RELIEF—
### GENDER, RACE, ETHNICITY AND NATIONAL ORIGIN DISCRIMINATION
### IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C.§ 2000e

107.    Plaintiff's repeats and reiterates each of the allegations above as if full repeated here at length.

#### *Good Samaritan Hospital/Bon Secours*

108.    Plaintiff is a Caucasian woman over 40 who had excellent job performance and no misconduct in her employment.

109.    Plaintiff took reasonable efforts to safeguard her employment, her person and her psychological well-being at GSH, where GSH and its management did not take action to protect her.

110.    Plaintiff suffer an adverse job action by her employer, namely, the creation of a hostile work environment, the suspension of her employment after she was physically assaulted by a sex harasser, and the termination of her employment based upon the patently ridiculous assertion by two men (Edwards and Jason) that she "harassed" one of them (Edwards). [2]

111.    The Hospital Defendant had no bona fide and good faith basis for concluding that Plaintiff had committed misconduct under the circumstances, and Defendants' conclusion that Plaintiff, a 48 year old woman, intentionally picked a fight with a 28 year old man known to her

---

[2] Plaintiff does not, in any way, "acknowledge" that GSH's decision was based upon a belief that Plaintiff "harassed" or "picked a fight" with Edwards.  GSH's assertion of such is merely a pretext for its discriminatory wrongdoing.)

to be a boxer and assaultive, is an implausible defense and baseless conclusion.

112.    Upon information and belief, the principal decision-maker for GSH was HR Director Franco, who is Afro-American, and who, upon information and belief, decided to accept the implausible description of his male Afro-American subordinates, rather than the victimized woman, for biased reasons including but not limited to protecting the members of his own gender and race, by finding fault by the white female victim, and covering up his own prior failure to properly address Plaintiff's complaint of sexual harassment by the male Afro-American boxer.

113.    The Defendant employers' and HR Director Franco's biased disregard for actual facts—namely, that Plaintiff was a completely innocent victim of gender violence—caused Plaintiff not only to suffer the adverse job action of the termination of her 27 years of employment, but also contributed to the Rockland County District Attorney prosecuting Mr. Edwards' harassment allegation against Plaintiff, forcing her to endure a criminal trial (she was acquitted) and to re-live the ordeal. [3]

114.    Plaintiff was damaged thereby, as set forth below.  Her employment was constructively terminated by GSH upon Mr. Edwards's vile verbal assault immediately before his physical battery of Plaintiff.

### Defendant 1199 Union

115.    Upon information and belief, Plaintiff's union, the local 1199 Union, was complicit with the employer is deciding to accept the utterly implausible version of events described by the two young Afro-American men, and reject the description of the middle-aged female victim.

116.    Upon information and belief, men throughout history have ganged up on women to commit violence against women, and this is a documented reality of human nature. [4]  This is not stereotyping.  Rather, it is anthropology, evolutionary psychology, and the history of mankind.

117.    The fact that the male decision-makers involved failed or refused to recognize the

---

[3] The prosecution was, as Plaintiff intends to show in this case, without probable cause and without a good faith basis.  It based upon Edwards accusation (not that of any police officer).  Moreover, the District Attorney's Office ignored the conflict of interest that existed by its prosecution of the victim of the felony assault upon Plaintiff that it was simultaneously prosecuting.)

[4] See, e.g., POTTS & HAYDEN, SEX AND WAR: HOW BIOLOGY EXPLAINS WARFARE AND TERRORISM AND OFFERS A PATH TO A SAFER WORLD (2010);  MICHAEL GHIGLIERI, THE DARK SIDE OF MAN (1999).

propensity for men to abuse women does not justify or excuse the institutional and governmental failure to protect Plaintiff as a victim of gender violence.

118.    Upon information and belief, the 1199 Union decision-maker was Patrick Forde, who is male and Afro-American. He misguidedly and intentionally failed to support Plaintiff in her demand for a grievance arbitration, for reasons that a jury can reasonably concluded were biased—because he purported to believe the Afro-American men and their version and/or justification of Edwards' vicious abuse and beating of Plaintiff.

119.    Thus, upon information and belief the 1199 Union failed to protect Plaintiff, because its male Afro-American representative, Mr. Forde, sought to protect its male Afro-American union member.

120.    Upon information and belief, the 1199 Union conspired with Plaintiff's employer to deprive her of the opportunity to have an independent arbitrator adjudicate whether Plaintiff committed misconduct, and misconduct warranting termination of employment.

120a.  Specifically, Plaintiff complained of sex harassment and racial harassment.  This was known to the Union (union delegate Charlotte Savoury) when HR Director Franco did nothing regarding Plaintiff's allegation of sex harassment and race harassment by Edwards.

120b.  The Union failed to help expedite Edwards move to a different department.  The Union was fully aware of Edwards' outlandishly vile gender and race-biased verbal obscenities screamed into Plaintiff's face (creating an intolerable work environment—sufficiently intolerable to constitute a constructive termination if Plaintiff had simply quit her job at that moment), and the Union had ample time after the physical beating to ascertain the relevant facts from HR Director Franco—namely, that Plaintiff was harassed, then vilely verbally assaulted, and then violently beaten.

120c.  A conspiracy is not only plausibly alleged here, it is <u>likely</u>.  The <u>only</u> realistic source of "credible" information that Plaintiff had been culpable in any way was from HR Director Franco.   He possessed the confidential information that Plaintiff complained of sexual harassment and race harassment, and that Edwards alleged that Plaintiff was racist.    Derek Jason did NOT allege that Plaintiff was racist; only  Edwards  alleged this to GSH's HR Department.

120d.  Upon information and belief, no reasonable arbitrator would have determined that Plaintiff's employment should be terminated after 27 years of faithful (and peaceful) service at

GSH, even if the arbitrator had determined that Plaintiff had slapped Mr. Edwards in the face
(she did not) for the vile and utterly abusive obscenities he directed toward her immediately
before severely beating her.

120e.  By depriving Plaintiff of the ability to obtain reinstatement of her employment
through an arbitration, where the Union had the right to bring the matter to arbitration on behalf
of Plaintiff (and Edwards as well), the Union unlawfully discriminated against Plaintiff as a
union member.  *See*, ¶¶ 93a – 93m, *supra*.

120f.  Upon information and belief, the Union allows grievance arbitration hearings for
male workers, and young workers, and Afro-American workers, for more significant alleged
misconduct than Plaintiff was alleged to have done, and under circumstances where restoration
of employment (based upon the employee's overall employment record and years of service) was
less likely than it would have been with Plaintiff Caruso.   Upon information and belief, the
denial of an arbitration hearing to Plaintiff Caruso was the product of unlawful bias against her.

120c.  Upon information and belief, grievance arbitration statistics will reveal that non-
Italians, males, workers under 40, and Afro-American are granted grievance arbitration hearings
at a higher proportional rate than Italian-Americans, women, Caucasians, and individuals over
40, and that, in any case, the accusations against the younger Afro-American men granted
arbitration are more serious than the accusation against Plaintiff (somehow triggering the savage
beating of herself in the workplace).

120d.  Upon information and belief, the Union's action and inaction was also the product
of "reverse discrimination," favoring Edwards by not allowing the subject of his conduct (and
that of the Union in countenancing his conduct) to proceed to a formal (arbitration) hearing.
120e.  Because the local 1199 Union discriminatorily decided to favor the young male Afro-
American member over its much older female member, Plaintiff lost her ability to be reinstated
to her employment through the grievance process.

**Morrison Services**

121.    To the extent that Morrison Services and its employees in the GSH food services
department were acting as agents of the Hospital Defendants, or as a de facto employer, it too
must be held accountable for the discriminatory termination of Plaintiff's employment.

122.    Upon information and belief, Morrison Services ran the GSH food service
department, and recommended or controlled personnel actions in that department, including the

ultimate corroboration of HR Director Franco's and GSH's decision to terminate Plaintiff's employment.

### *Damages*

123.    As a proximate result of defendants' actions, Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

124.    As a further proximate result of defendants' discrimination against plaintiff, plaintiff has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

125.    As a further proximate result of defendants' actions, plaintiff has suffered and continues to suffer severe and lasting mental distress, anxiety, post-traumatic stress disorder (PTSD), embarrassment, humiliation and anguish, damage to her good reputation, and other incidental and consequential damages and expenses.

126.    Plaintiff has been damaged thereby.

127.    The conduct of defendants was wanton, outrageous and malicious, was intended to injure plaintiff, and was done with reckless indifference to plaintiff's protected civil rights, entitling plaintiff to an award of punitive damages.

**SECOND CLAIM FOR RELIEF—**
**RACIAL DISCRIMINATION IN TERMINATION OF EMPLOYMENT**
**IN VIOLATION OF THE CIVIL RIGHTS ACT of 1866, 42 U.S.C. § 1981**

128.    Plaintiff's repeats and reiterates each of the allegations above as if full repeated here at length.

### *Good Samaritan Hospital/Bon Secours*

129.    The Civil Rights Act of 1866, 42 U.S.C. § 1981, protects individuals from employment discrimination based upon race.

130.    Plaintiff is a white woman discriminated against in the terms and conditions of her employment contract with the Hospital Defendants on account of race.

131.    The Hospital Defendants ended Plaintiff's contract of employment on account of her race, in an intentional effort to favor three men (Edwards, Jason and Franco) of the Afro-American race.

132.    Plaintiff has been damaged thereby.

133.    The conduct of defendants was wanton, outrageous and malicious, was intended to injure plaintiff, and was done with reckless indifference to plaintiff's protected civil rights,

entitling plaintiff to an award of punitive damages.

### 1199 Union

134.   Plaintiff also had contractual rights with her union, under its collective bargaining agreement with the Hospital Defendants.

135.   Upon information and belief, the 1199 Union decision-maker was Patrick Forde, who is male and Afro-American.

136.   Upon information and belief the 1199 Union failed to employ Plaintiff's collectively bargained (CBA) rights to protect Plaintiff, because its male Afro-American representative sought to protect its male Afro-American union member, on account of race.

137.   The local 1199 Union denied Plaintiff the contractual rights available to her to obtain the reinstatement of her employment on account of Plaintiff's race.

138.   Plaintiff was damaged thereby.

139.   The conduct of defendants was wanton, outrageous and malicious, was intended to injure plaintiff, and was done with reckless indifference to plaintiff's protected civil rights, entitling plaintiff to an award of punitive damages.

**THIRD CLAIM FOR RELIEF—
AGE DISCRIMINATION IN VIOLATION OF THE
AGE DISCRIMINATION IN EMPLOYMENT ACT ("ADEA"),
29 U.S.C. § 621 *et seq.***

140.   Plaintiff hereby repeats and reiterates each of the allegations above as if full repeated here at length.

141.   Upon information and belief, "but for" Plaintiff's age, Defendant would not have had such animus regarding Plaintiff's gender, national origin and race.

142.   Specifically, if Plaintiff were a young and beautiful woman being sexually harassed, and then beaten up, the Hospital Defendants and Mr. Franco would not have had the audacity to accuse her of initiating a physical confrontation resulting in her own savage beating.

143.   Because Plaintiff is a (still-attractive) older woman, age bias caused the Hospital Defendants adverse decision-making.

144.   Upon information and belief, a reasonable jury will find Plaintiff's age to be a "but for" cause of her termination.

145.   Plaintiff has been damaged thereby.

146.   Under the ADEA, Plaintiff is also entitled to an award of liquidated damages.

### FOURTH CLAIM FOR RELIEF—
### RETALIATION IN VIOLATION OF
### 42 U.S.C. § 2000e and § 1981

147.    Plaintiff's repeats and reiterates each of the allegations above as if full repeated here at length.

148.    Plaintiff's reported and objected to unlawful discrimination against plaintiff and others, and had an objective and reasonable belief that defendant was engaged in conduct unlawful under Title VII and § 1981.

149.    Plaintiff opposed such unlawful conduct by making good faith claims or complaints of discrimination to defendant.

150.    As a consequence, defendant engaged in adverse treatment of plaintiff, including permitting the continuance of a hostile work environment, and faulting Plaintiff for being a victim of gender violence.

151.    Plaintiff was damaged thereby.

### FIFTH CLAIM FOR RELIEF—
### VIOLATION OF FAIR LABOR STANDARDS ACT
### 29 U.S.C. § 207

152.    Plaintiff hereby repeats and reiterates each of the allegations above as if full repeated here at length.

153.    Plaintiff accrued vacation pay and other time accruals, and wages, while employed by the Hospital Defendants.

154.    Upon her termination, Plaintiff was not paid for work she performed, was not paid for her accrued vacation time, and not paid other time accruals.

155.    Plaintiff's regular pay was under $46,800 per year (and under $900 per week), and therefore was entitled to receive "benefits or wage supplements as defined in [N.Y.S. Labor Law § 198-c]…."

156.    Section 198-c(2) provides: "As used in this section, the term 'benefits or wage supplements' includes . . . vacation, separation or holiday pay."

157.    Because Plaintiff was paid less than $900 per week, the exclusion contained in §198-c  ("any person in a bona fide executive, administrative, or professional capacity whose earnings are in excess of six hundred dollars a week") did not apply to Plaintiff.

158.    Therefore, Plaintiff was entitled to timely payment of her vacation pay.

159.    Plaintiff was damaged thereby.

160.    Under the FLSA, Plaintiff is entitled to liquidated damages in a sum equal to the compensation she should have been paid.

161.    Under the FLSA, Plaintiff is also entitled to an award of mandatory attorney's fees for Defendants' violation of the law.

**SIXTH CLAIM FOR RELIEF—**
**CONSPIRACY TO OBSTRUCT PLAINTIFF'S CIVIL RIGHTS**
**42 U.S.C. § 1985**

162.    Plaintiff hereby repeats and reiterates each of the allegations above as if full repeated here at length.

163.    42 U.S.C. Section 1985 provides, in relevant part at subdivision 2, that an injured person may have an action for the recovery of damages:

> "If two or more persons …conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws…."

164.    Upon information and belief, Defendants Edwards, Jason , Franco, the Hospital Defendants and the 1199 Union conspired to impede, hinder, obstruct and defeat Plaintiff's right to the equal protection of the law, namely, her right to give testimony against her assailant, Mr. Edwards without the threat of herself being prosecuted (or being fired from her job of 27 years); her right to non-termination of her contract at will based upon her and Mr. Edwards's race (protection under 42 U.S.C. § 1981);  and to the fair administration of criminal justice, by hindering and obstructing her right to provide testimony as a victim regarding the prosecution of her assailant, Mr. Edwards, which right is safeguarded both by the N.Y.S. Victim Rights Act and the federal Bill of Rights' First Amendment right to petition government for redress.

165.    The Defendants conspired to deprive Plaintiff of the equal protection of federal and state laws apart from Title VII's provisions against employment discrimination.  As alleged above, GSH (through Mr. Franco) sought and obtained the agreement of the Union to deprive Plaintiff of her contractual rights under the CBA, based upon her and Mr. Edwards' race.  GSH and the Union then colluded to ignore the vile gender-based obscenities Edwards screamed in Plaintiff's face immediately prior to beating her.  GSH, the Union, Mr. Jason and Mr. Edwards then colluded and conspired to deprive Plaintiff of the equal protection of the law (e.g., her contractual rights under the CBA, her right under 42 U.S.C. § 1981 not to have her contractual

rights to her employment impaired on account of race; and on May 20, 2014, the denial of her right to have a witness testify as a defense witness regarding Edwards' accusation of the criminal violation of harassment in a justice court criminal case). The GSH – Union collusion to allow an abusive Edwards to continue working with Plaintiff violated her fundamental constitutional right to autonomy by her being brutally beaten by a racially misogynist Edwards. The animus was based upon Plaintiff's race, her national origin and her gender (and favored Edwards' race and gender).

166.    As to Edwards' criminal harassment accusation being prosecuted in the Suffern Justice Court, upon information and belief to aid the interference with Plaintiff's civil rights, Defendant Franco failed and refused to appear at the justice court, without just cause. even though he was properly served with a subpoena *ad testificandum* to give testimony at the Suffern Justice Court trial of *People v. Patrizia Caruso,*

167.    Upon information and belief, the District Attorney of Rockland County, and his staff, were complicit in this, and conspired with Mr. Edwards in this, by negotiating a plea bargain without any input whatsoever from Plaintiff, whereby Mr. Edwards would escape any jail or prison time, escape even a monetary fine, escape the requirement to pay Plaintiff any restitution or reparation, and escape a conviction for an actual assault (his plea was to attempted assault, an E felony). Plaintiff sought to input the felony dispositional process, and was unlawfully refused her rights under N.Y.S. law, and also, based upon Defendant's wrongful input, denied her federal First Amendment right to petition government for redress.

168.    Plaintiff has been damaged thereby.

**SEVENTH CLAIM FOR RELIEF—**
**SUPPLEMENTAL CLAIM UNDER N.Y.S. EXECUTIVE LAW § 296 ET SEQ**
**FOR UNLAWFUL EMPLOYMENT DISCRIMINATION & REPRISAL**

169.    Plaintiff's repeats and realleges each of the allegations above as if full repeated here at length.

170.    The Hospital Defendants' discriminatory treatment of Plaintiff, and termination of Plaintiff's employment, on the basis of her race, national origin, gender and age was in violation of the New York State Human Rights Law. *See*, N.Y.S. Exec. Law s. 296 *et seq*.

171.    Defendants Jason, Edwards, Franco and Morrison Services, and the 1199 Union, aided and abetted the Hospital Defendants' discriminatory and retaliatory actions.

172.    Plaintiff was damaged thereby.

**EIGHTH CLAIM FOR RELIEF—**
**SUPPLEMENTAL CLAIM UNDER N.Y.S. COMMON LAW –**
**BATTERY BY DEFENDANT EDWARDS**

173.    Plaintiff's repeats and realleges each of the allegations above as if full repeated here at length.

174.    Without legal justification, Defendant Edwards placed Plaintiff in fear of physical battery, and physically and brutally beat the Plaintiff, causing her severe physical and mental injury.

175.    Defendant Edwards intended to make bodily contact upon Plaintiff with his fists.

176.    Defendant Edward actions were brutally harmful and offensive in nature.

177.    Plaintiff was damaged thereby.

178.    Defendant Edwards' actions were vindictive and malicious, thereby authorizing an award of punitive damages.

**NINTH CLAIM FOR RELIEF—**
**SUPPLEMENTAL CLAIM UNDER N.Y.S. COMMON LAW--**
**DEFAMATION**

179.    Plaintiff's repeats and realleges each of the allegations above as if full repeated here at length.

180.    Defendant Jason spoke and wrote false statements of fact pertaining to the Plaintiff, and specifically by sworn statements dated in June and July 2013, falsely and materially stated to others that Plaintiff had hit and/or slapped Mr. Edwards, and provoked a physical altercation.

181.    For example, by official statement written on July 15, 2013, Mr. Edwards falsely stated that:

> "Patrizia Caruso was verbally abusive and when I walked away from her into another room , she ran up behind me, blindsiding me. She struck me from the right side hitting my face with her hand causing my upper lip to bleed and grabbed my neck trying to pull, me down."

182.    By "Supporting Deposition" written on July 5, 2013, Mr. Jason falsely stated, among other things, that:

> "I stepped in between Pat and Charles and told them to 'chill out.'"
> ***
> "Charles walked into the office behind me as I was kneeling on the floor to·get my supplies. I looked up toward Charles and I saw Pat coming in the door behind Charles. Charles had his back to Pat. It appeared that Pat was biting her lip and

then suddenly struck Charles on the right side of his face and head. Charles is starting to turn around and Pat grabs Charles by the shirt and swings again at him. At the same time Pat is swinging at Charles, Charles swings at Pat, hits her and she falls to the floor. Charles jumps on top of her and grabbed her by the neck and punched Pat about 6 times in the side of her face."

183.    Mr. Jason gave inconsistent, differing, and also materially false statements to the N.Y.S. Workers' Compensation Board, and the Suffern Justice Court.

184.    The statements by Mr. Edwards and Mr. Jason were intentionally false statements, designed to mitigate Mr. Edwards brutal physical beating of Plaintiff, thereby prejudicing Plaintiff's legal rights and ability to obtain available remedies.

185.    Defendants' statements were intentionally and materially false.

186.    Plaintiff was damaged thereby.

### TENTH CLAIM FOR RELIEF— SUPPLEMENTAL CLAIM UNDER N.Y.S. COMMON LAW-- NEGLIGENCE

187.    Plaintiff's repeats and realleges each of the allegations above as if full repeated here at length.

188.    The Hospital Defendants and Morrison Services owed a duty of due care to safeguard Plaintiff's legitimate rights and expectations to be allowed to work in a safe work environment, and not to be physically assaulted by a co-worker.

189.    The Hospital Defendants and Morrison Services breached a duty of due care, in their failure to safeguard Plaintiff's legitimate rights and expectations to be allowed to work in a safe work environment, and not to be physically assaulted by a co-worker.

190.    Defendants' acts and omissions proximately caused Plaintiff injuries.

191.    Defendant Derek Jason neglected and failed to protect Plaintiff from Edwards' assault and battery, even after Plaintiff lie prostrate on the floor, with Jason being the only person able to help stop the vicious battery.

192.    Plaintiff has been damaged thereby.

### ELEVENTH CLAIM FOR RELIEF— SUPPLEMENTAL CLAIM UNDER N.Y.S. COMMON LAW--, MALICIOUS PROSECUTION

193.    Plaintiff's repeats and realleges each of the allegations above as if full repeated here at length.

194.    Defendant Edwards lodged a criminal charge (harassment) against Plaintiff.

195. Such charge was knowingly, maliciously and falsely alleged by Mr. Edwards, without a basis in fact.

196. Such charge was knowingly, maliciously and falsely corroborated by Mr. Edwards, without a basis in fact.

197. Such charged lacked probable cause, and was based upon malice.

198. Plaintiff was acquitted of the charge, after a bench trial held on May 20, 2014 in Suffern Justice Court, exonerating Plaintiff with a fact-finding favorable to the accused.

199. Plaintiff has been damaged thereby.

**TWELFTH CLAIM FOR RELIEF—**
**SUPPLEMENTAL CLAIM UNDER N.Y.S. LABOR LAW §§ 740 & 741**

200. Plaintiff's repeats and realleges each of the allegations above as if full repeated here at length.

201. Plaintiff acted to protect patients in her role as a GSH food service worker.

202. Plaintiff complained that Defendant Edwards and Defendant Jason were not properly performing their jobs regarding the delivery of safe food to patients.

203. Defendants Edwards and Jason endangered the public safety, and their inattention regarding the possible delivery of allergenic food to GSH patients created a substantial and specific danger to the public and to public health.

204. The Hospital Defendants acted impermissibly toward Plaintiff, by firing her based upon the accusations of individuals (Edwards and Jason) against whom she previously "blew the whistle" to protect hospital patients.

205. Plaintiff has been damaged thereby.

**THIRTEENTH CLAIM FOR RELIEF—**
**SUPPLEMENTAL CLAIM UNDER N.Y.S. COMMON LAW –**
**ASSAULT BY DEFENDANT EDWARDS**

206. Plaintiff's repeats and realleges each of the allegations above as if full repeated here at length.

207. Prior to his battery of Plaintiff, Defendant Edwards made an unjustifiable threat of physical force against Plaintiff.

208. This was made with the intention to arouse Plaintiff's apprehension.

209. This created a reasonable apprehension of immediate physical harm.

210. It included the present ability of Defendant Edwards to effectuate the threat.

211.    Plaintiff was injured thereby.

**FOURTEENTH CLAIM FOR RELIEF—**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS BY DEFENDANT JASON**

212.    Plaintiff's repeats and reiterates each of the allegations above as if full repeated here at length.

213.    Upon information and belief, Defendant Jason knew that by falsely portraying Plaintiff as an aggressor, resulting in a physical altercation with Defendant Edwards, that GSH policy was to terminate both employees.

214.    Defendant Jason disliked Plaintiff, and Plaintiffs' prior actions in critiquing his hospital food service activities (as he had potentially endangered hospital patients).

215.    A contractual employment relationship existed between Defendant GSH and Plaintiff.

216.    A contractual collective bargaining relationship existed between the 1199 Union and Plaintiff.

217.    By falsely portraying Plaintiff as an aggressor, Defendant Jason intentionally induced Defendant GSH to terminate its contractual (employment) relationship with Plaintiff.

218.    Similarly, Defendant Jason's actions caused Plaintiff to terminate her union relationship with the 1199 Union, because of the termination of her employment for the alleged fighting, and for the Union to breach its contractual obligations owed to Plaintiff, by failing and refusing to pursue a CBA grievance to restore her GSH employment.

219.    The loss of Plaintiff's employment provided additional job security to Defendant Jason, by subjecting him to less scrutiny of his work.  Defendant Jason's desire to interfere with Plaintiff's employment contract with GSH was also influenced by racial bias.

220.    Plaintiff was damaged thereby.

**FIFTEENTH CLAIM FOR RELIEF—**
**FAILURE TO AID, AND *PRIMA FACIE* TORT, BY DEFENDANT JASON**

221.    Plaintiff's repeats and reiterates each of the allegations above as if full repeated here at length.

222.    Upon information and belief, Defendant Derek Jason is a member of the military reserve or National Guard.

223.    Upon information and belief, Defendant Jason was and is physically stronger than Defendant Edwards.

224.    Upon information and belief, Defendant Jason was in a position to stop Defendant Edwards from continuing his brutal battery of the Plaintiff, especially as she lay helpless on the floor, being beaten by Edwards.

225.    Defendant Jason did nothing, upon information and belief, until other co-workers arrived at the door.

226.    Defendant Jason, upon information and belief, encouraged Edwards' assault by Jason's inaction.

227.    Upon information and belief, Defendant Jason harbored animosity toward Plaintiff, and shared and harbored with Edwards racial animosity toward Plaintiff.

228.    Defendant Jason's subsequent lies and distortions regarding Plaintiff's actions, including falsely stating that Plaintiff had struck Defendant Edwards, were additional actions maliciously intended to injure and harm the Plaintiff.

229.    Even if no particular act of Defendant Jason were unlawful, the series of acts had malicious intention.

230.    Defendant Jason's actions were without lawful excuse or justification.

231.    Plaintiff suffered special damages, including herself being prosecuted for crime (harassment second—and the attorney's fees of over $7,500 to defend same), losing her job, being denied workers' compensation benefits, and suffering physical injury from Edwards' battery.

232.    Plaintiff was damaged thereby.

### SIXTEENTH CLAIM FOR RELIEF__
### NEGLECT TO AID IN CIVIL RIGHTS, IN VIOLATION OF
### 42 U.S.C. § 1986

233.    Plaintiff's repeats and reiterates each of the allegations above as if full repeated here at length.

234.    Defendant Roger Franco knew that his testimony was sought by Plaintiff in connection with the Justice Court criminal case pending against Plaintiff.

235.    Defendant Franco was subpoenaed to be present at the Justice Court trial.

236.    Defendant Franco refused to obey the lawful subpoena, and was not present to offer his testimony at Plaintiff's May 20, 2014 criminal trial.

237.    Defendant Franco's testimony was needed and relevant for Plaintiff's defense

against Mr. Edwards's harassment charge against her, to provide evidence to the Justice Court that Plaintiff was a victim of class-based animus, including but not limited to Mr. Edwards's racial harassment on the job at GSH.

238.    Defendant Franco's neglect also evidences his personal animosity toward Plaintiff, and his favoring of Mr. Edwards, and evidences his race-based and gender-based bias against Plaintiff.

239.    Plaintiff was damaged thereby.

### DEMAND FOR JURY

*Plaintiff hereby demands trial by jury in this action*
*to the extent allowed by law.*

WHEREFORE, Plaintiff prays that this Court grant judgment containing the following relief:

A.  An award of plaintiff's actual damages in an amount to be determined at trial for loss of wages, benefits, and promotional opportunities, including an award of back pay and front pay compensating plaintiff for loss of past and future salary and benefits;

B.  An award of damages to be determined at trial to compensate plaintiff for physical injuries, mental anguish, humiliation, embarrassment, reputational damage, and emotional injury;

C.  An award of punitive damages and liquidated damages;

D.  An order enjoining defendants from engaging in the wrongful practices alleged herein and to reinstate Plaintiff's employment with Defendant;

E.  An award of reasonable attorneys' fees and the costs of this action; and

F.  Such other and further relief as this Court may deem just and proper.

Dated:  Stony Point, New York
        September 22, 2014


_____/S/_____
MICHAEL D. DIEDERICH, JR.
*Attorney for Plaintiff   MD 2097*
361 Route 210
Stony Point, NY 10980
(845) 942-0795
Mike@DiederichLaw.com

Attachments
  Exhibits "1" & "2" – Right to Sue Letters
  Exhibit "3"-- photos

EEOC Form 161-B (11/09)   **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| | |
|---|---|
| To:  **Patrizia Caruso**<br>      **39 Montclair Avenue**<br>      **Airmont, NY 10952** | From:  **New York District Office**<br>        **33 Whitehall Street**<br>        **5th Floor**<br>        **New York, NY 10004** |

☐   On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2014-01098** | **Charles K. Diamond, Investigator** | **(212) 336-3771** |

(See also the additional information enclosed with this form.)

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐   More than 180 days have passed since the filing of this charge.

☒   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒   The EEOC is terminating its processing of this charge.

☐   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☒   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

*Kevin J. Berry*

**Kevin J. Berry,
District Director**

6/12/2014
(Date Mailed)

cc:
**Director, Human Resources
BON SECOURS CHARITY HEALTH SYSTEM INC.
255 Lafayette Ave
Suffern, NY 10901**

**Sidney R. Steinberg
POST & SCHELL
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103**

**Michael D. Diederich, Jr.
MICHAEL D. DIEDERICH JR. ATTORNEY AT LAW
361 Route 210
Stony Point, NY 10980**

COMPLAINT EXHIBIT "1"

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Patrizia Caruso**<br>**39 Montclair Avenue**<br>**Airmont, NY 10952** | From: | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2014-01104** | **Charles K. Diamond, Investigator** | **(212) 336-3771** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☒ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Kevin J. Berry,
**Kevin J. Berry,**
**District Director**

6/12/2014
*(Date Mailed)*

Enclosures(s)

cc:
**Union President**
**1199 SEIU UNITED HEALTH CARE WORKERS EAST**
**310 West 43rd Street**
**New York, NY 10036**

**Michael D. Diederich, Jr.**
**MICHAEL D. DIEDERICH, JR.**
**361 Route 210**
**Stony Point, NY 10980**

**Vanessa Flores**
**LEVY RATNER PC**
**80 Eighth Ave., 8th Fl.**
**New York, NY 10011**

Complaint Exhibit "2"



COMPLAINT EXHIBIT "3"