UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
PATRIZIA CARUSO,                                        :
                                    Plaintiff,          :
                                                       :          **OPINION AND ORDER**
v.                                                      :
                                                       :          14 CV 4447 (VB)
BON SECOURS CHARITY HEALTH SYSTEM       :
INC., GOOD SAMARITAN REGIONAL           :
MEDICAL CENTER, ROGER A.                :
FRANCO, and CHARLES EDWARDS,            :
                                    Defendants.         :
----------------------------------------------------------------x

Briccetti, J.:

Plaintiff Patrizia Caruso brings this action against her former employer, Good Samaritan Regional Medical Center ("GSH"); its parent company, Bon Secours Charity Health System Inc. ("Bon Secours"); GSH's Director of Human Resources, Roger A. Franco; and plaintiff's co-worker, Charles Edwards. Plaintiff asserts claims for gender, race, ethnicity, national origin, and age discrimination under both federal and state statutes. Plaintiff also brings numerous tort claims under New York State law.

Defendants GSH, Bon Secours, and Franco (collectively referred to herein as the "Hospital Defendants") have moved for summary judgment (Doc. #171) and to exclude plaintiff's expert reports (Doc. #173).

For the reasons set forth below, the motions are GRANTED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

The parties have submitted briefs, affirmations with supporting exhibits, and statements of material facts pursuant to Local Civil Rule 56.1, which reflect the following factual background.

Plaintiff is a fifty-one year old Caucasian woman who was born in Italy.  She worked in GSH's Dietary Department from 1986 until her termination in July 2013.  From 2011 until her termination, plaintiff's job title was Catering Associate.

I. Co-workers and Unwanted Sexual Advances

In early 2011, plaintiff was assigned to train a new Catering Associate named Derrick Jason.  Jason is African American.  During Jason's training, plaintiff was speaking to a group of co-workers and stated, "I have another slave today," referring to Jason.  Plaintiff's manager brought to plaintiff's attention the racial offensiveness of the "slave" comment.  When the manager pointed out her own dark skin color to plaintiff, plaintiff replied, "no shit."  (Pl.'s Dep at 129).  On February 4, 2011, plaintiff received a written warning for using "vulgarity when she was addressed by her immediate supervisor as to the inappropriate use of the term slave when describing a fellow employee."  (Pl.'s Dep, Ex. 3).

In the summer of 2011, GSH hired defendant Charles Edwards as a Catering Associate. Edwards, like Jason, is African American.  Plaintiff helped train Edwards.  During the training period, there was friction between plaintiff and Edwards when plaintiff would tell Edwards that he made a mistake.  According to plaintiff, when she corrected Edwards, he would question her, or state things like, "do not disrespect me."  (Pl.'s Dep. at 140).

One day in 2012, Edwards asked a group of co-workers for a ride home, and plaintiff volunteered to drive him.  According to plaintiff, during the ride, Edwards told her she was a beautiful woman, asked her to go out with him, and touched her leg.  Plaintiff told Edwards he was acting inappropriately, and told him to stop touching her leg.

Plaintiff testified that "every day after that ride," Edwards told plaintiff she was attractive and asked her out.  (Pl.'s Dep. at 161).  According to plaintiff, in December 2012, Edwards

attempted to kiss her while in an elevator at work.  Plaintiff thought his sexual advances were "just a stupid kid doing stupid things" and "something that's not a big deal."  (Pl.'s Dep. at 163-64).

## II.      February 2013 Incident

In February 2013, as part of their duties, plaintiff and Edwards were wrapping silverware, when plaintiff accused Edwards of stealing silverware.  Edwards responded by expressing his perception that plaintiff made the accusation because he is African American.  The next day, plaintiff complained to a superior about Edwards stealing silverware.

The superior arranged a meeting with defendant Roger Franco, Bon Secours's Director of Human Resources.  In the meeting, plaintiff described the silverware incident and told Franco that Edwards had accused her of being racist.  Franco asked plaintiff if there was anything else of which he should be aware.  Plaintiff informed him of Edwards's sexual advances towards her, including Edwards's attempt to kiss her in the elevator.

On February 18, 2013, plaintiff, Edwards, and Franco met with a union delegate from plaintiff's and Edwards's union.  Both plaintiff and Edwards acknowledged a willingness to leave their issues in the past and work together, in part because Edwards wanted to be transferred out of the Dietary Department, and Franco told them "it's not going to take long for [Edwards] to be moved."  (Pl.'s Dep. at 205).  Franco warned Edwards that any disciplinary action on his record would inhibit his ability to transfer.  Plaintiff contends Franco was "protecting Edwards at [plaintiff's] expense."  (Pl.'s 56.1 Resp. ¶ 48).

Following this meeting, Edwards did not make any sexual advances toward plaintiff, plaintiff never complained about Edwards again, and the two continued working together without incident until June 25, 2013.

3

III.     <u>Physical Fight and Franco's Investigation</u>

On the evening of June 25, 2013, Edwards approached plaintiff in the dishroom and asked plaintiff for silverware.  According to plaintiff, she told him to wait, at which point Edwards began shouting obscenities at her.  A co-worker intervened and told Edwards to calm down.  Edwards walked out of the room into the adjacent nutrition office.  According to plaintiff, while walking out, Edwards shouted, among other things, "suck my dick" and "have your husband suck my dick."  (Defs.' Ex. G; Pl.'s Dep at 229-30).

When Edwards entered the nutrition office, Jason was there.  Plaintiff entered shortly thereafter.  The parties dispute whether plaintiff merely touched Edwards to get his attention, grabbed Edwards's shirt, or hit Edwards, but it is undisputed that Edwards punched plaintiff, causing serious injuries.  The police came and plaintiff was taken to the hospital.

In the days following the fight, Franco interviewed plaintiff, Edwards, and Jason, as well as four other employees who were present during the altercation in the dishroom.[1]  Cat Correll, the Food Service Director, was present for the interviews.

Franco's notes from the investigation reflect Jason's recollection that plaintiff hit Edwards and grabbed his shirt, and then Edwards began punching plaintiff in the face.  Edwards also reported that plaintiff struck him first.  (Defs.' Ex. J).  Plaintiff told the police "that she went after Edwards and grabbed his shirt."  (Defs.' Ex. H).  Plaintiff told Franco she "touched" Edwards's "shoulder to get his attention."  (Defs.' Ex. I).

---

[1]     Plaintiff disputes the validity of the investigation, claiming "Franco's 'investigation' was biased in favor of Mr. Edwards and against [plaintiff]."  (Pl.'s 56.1 Resp. ¶ 57).

In early July 2013, several Bon Secours management employees met to plan a disciplinary response.[2]  The participants were (i) Pamela Tarulli, Bon Secours's Senior Vice President of Human Resources, a Caucasian woman; (ii) Claire Brady, the Senior Vice President of Mission, a Caucasian woman; (iii) Cat Correll, the Food Service Director, an Asian-American woman; (iv) Jim Wilson, the Interim Chief Operating Officer, a man whose race is not clear from the record; and (v) Franco, an African American man (collectively referred to herein as the "managers").

Franco explained that plaintiff said she did not hit Edwards, while Jason and Edwards said plaintiff struck Edwards.  Plaintiff contends Franco "informed his decision-making colleagues that [plaintiff] was accused of being racially biased," apparently in reference to plaintiff's previous discipline stemming from her use of the word "slave," or the February 2013 silverware wrapping incident.  (Pl.'s Opp. at 9).  None of the managers recalled any discussion of plaintiff's or Edwards's age, race, national origin, or of their prior relationship.

Bon Secours's "Standards of Conduct," dated February 10, 2010, classifies "any degree of fighting . . . with a . . . co-worker" as a "Major Violation," which may result in "severe disciplinary actions," including termination.  (Pl.'s Dep., Ex. 7).  At the meeting, the managers determined plaintiff had initiated physical contact with Edwards after plaintiff followed him into the nutrition office.  Accordingly, Bon Secours's management concluded both Edwards's and plaintiff's behavior violated the Standards of Conduct policy prohibiting violence and decided to terminate them both.

---

[2]     Plaintiff speculates, without evidentiary support, that this meeting's true purpose was to "minimiz[e] the possibility of a lawsuit by Mr. Edwards, by imposing unwarranted discipline upon a sexually-harassed and physically brutalized female employee."  (Pl.'s 56.1 Resp. ¶ 65).

On July 19, 2013, plaintiff and Edwards received letters of termination for "violating Bon Secours Charity Health System's policy regarding violence in the workplace."  (Defs.' Ex. M).[3]

IV.    Procedural History

Plaintiff filed her complaint on June 19, 2014 (Doc. #1), and an amended complaint on September 23, 2014.  (Doc. #28).  The amended complaint asserts sixteen causes of action.[4]

Edwards moved to dismiss two causes of action (Doc. #62), and plaintiff moved for summary judgment on the battery claim against Edwards.  (Doc. #71).  The Court granted in part and denied in part Edwards's motion to dismiss, and denied plaintiff's motion for summary judgment.  (Doc. #108).  The Court also denied plaintiff's motion for reconsideration of that decision (Doc. #129), and denied plaintiff's motion to dismiss her state law claims (Docs. #143).

On June 29, 2015, plaintiff identified three experts.  The first was Dr. Rachel Bush, a clinical psychologist who would testify as to "[t]he behavior of women when confronted by abusive or aggressive men; automatic or involuntary human responses to aggression-caused stress; the fact that a female slapping a man may be a reasonable defense mechanism; racism in

---

[3]    Both plaintiff and Edwards were prosecuted by the Rockland County District Attorney. Plaintiff was acquitted of harassment after a bench trial.  Edwards pleaded guilty to attempted assault and was sentenced to five years' probation.

[4]    The amended complaint included three defendants and several claims that have since been dismissed from the case.  (Docs. ##107, 123, 167).  Of the amended complaint's 16 original claims, the following 11 claims remain pending: a Title VII claim for gender, race, ethnicity, and national origin discrimination (First Claim); a Section 1981 claim for racial discrimination (Second Claim); an ADEA claim for age discrimination (Third Claim); retaliation claims under Title VII and Section 1981 (Fourth Claim); a New York State Human Rights Law claim for employment discrimination on the basis of race, national origin, gender, and age (Seventh Claim); a battery claim against Edwards only (Eighth Claim); a defamation claim against Edwards only (Ninth Claim); a negligence claim (Tenth Claim); a malicious prosecution claim against Edwards only (Eleventh Claim); an assault claim against Edwards only (Thirteenth Claim); and a Section 1986 claim for neglect to aid in civil rights against Franco only (Sixteenth Claim).

the workplace." (Defs.' Mot. to Excl., Ex. A at 1). Plaintiff attached Dr. Bush's tentative report and curriculum vitae to the expert disclosure.

Plaintiff also identified Dr. Chitra Raghavan and William Cucolo as experts. Plaintiff provided a curriculum vitae for Dr. Raghavan only, and did not submit reports for either. Plaintiff's counsel wrote that "a written report may not be required" because "these witnesses may be providing testimony on a voluntary, unpaid basis, and not as an expert 'retained or specially employed to provide expert testimony.'" (Defs.' Mot. to Excl., Ex. A at 3).

On January 13, 2016, the Hospital Defendants moved for summary judgment and to exclude the expert opinions of Dr. Bush. (Docs. ##168, 170). Plaintiff opposed the motions (Doc. #187), arguing that the testimony of all three experts should be included and considered on summary judgment. She also submitted reports for Dr. Raghavan and Mr. Cucolo.[5] The Hospital Defendants replied in support of the motions, arguing Dr. Rahavan's and Mr. Cucolo's expert testimony should also be excluded. (Doc. #189).

## DISCUSSION

### I.      Summary Judgment Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

---

[5]      The subject matter of Dr. Raghavan's opinions is largely the same as Dr. Bush's. Mr. Cucolo's opinions focus on "employee and union relations when the employee is represented by a union under a collective bargaining agreement." (Cucolo Decl. at 1).

A fact is material when it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See id.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of her case on which she has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for her.  Dawson v. Cnty. Of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which

summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider admissible evidence. Nora Bevs., Inc. v. Perrier Grp. Of Am. Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II.    Daubert Motion

As an initial matter, the Hospital Defendants object to the Court's consideration of plaintiff's three expert witnesses, and move to exclude their proffered testimony.

Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), trial courts serve as gatekeepers for expert testimony. Trial courts may decide whether expert testimony is admissible in ruling on a motion for summary judgment. Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).

Rule 702 of the Federal Rules of Evidence provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's testimony (i) is based on sufficient facts or data; (ii) is the product of reliable principles and methods; and (iii) has reliably applied the principles and methods to the facts of the case. See Fed. R. Evid. 702. Thus, "Rule 702 requires a trial court to make an initial determination as to whether the proposed witness qualifies as an expert. If this threshold requirement is met, then a court must inquire into whether the scientific, technical or other specialized testimony provided by that expert is both relevant and reliable." Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 352-53 (S.D.N.Y. 2003).

"Under Daubert and Rule 702, expert testimony should be excluded if the witness is not actually applying expert methodology. Incorporating the Daubert standard, the amended Rules of Evidence require that expert testimony be based on 'sufficient facts or data' and on 'reliable

principles and methods' that the expert 'witness has applied reliably to the facts of the case.'"

United States v. Dukagjini, 326 F.3d 45, 54 (2d Cir. 2003) (quoting Fed. R. Evid. 702).  The

proponent of expert testimony bears the burden of establishing its admissibility by a

preponderance of the evidence.  Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d at 353.

      A.     Dr. Bush

The Hospital Defendants argue Dr. Bush's proffered testimony should be excluded

because her opinions are unreliable.

The Court agrees.

Dr. Bush's report contains the following opinions:

i. Plaintiff "felt that her only option was to address Mr. Edwards'[s] personally offensive conduct directly."  (Bush Report ¶ 10).

ii. "It is unlikely . . . that [plaintiff] slapped Mr. Edwards, and even more unlikely that she struck him with a fist."  (Id. ¶ 12).

iii. "Responding with anger, or perhaps striking back, is a healthy and extremely normal reaction."  (Id. ¶ 13).

iv. "A reasonable HR official should have realized that Mr. Jason's memory could be faulty."  (Id. ¶ 16).

v. "[I]n light of the severity of [plaintiff's] beating, the employer clearly should have recognized that fault lay with Mr. Edwards, not with his victim."  (Id. ¶ 19).

vi. "[I]t appears that [Franco's] personal bigotry (racial, sex and age) continually influenced and biased his observations and decision-making."  (Id. ¶ 20).

vii. "[Plaintiff's] termination was clearly motivated by sex and race discrimination and retaliation for her having reported racial bias and sex harassment.  Simply put, the GSH HR Director Franco's failure and refusal to recognize [plaintiff's] victimization (by Mr. Edwards) is undoubtedly the result of racial and gender bias, and HR Director Franco's deep personal bigotry.  People of Color tend to believe these attributes are reenacted every day in interpersonal interactions."  (Id. at ¶ 22).

Even assuming, arguendo, that Dr. Bush is qualified to opine on all of these matters, her

testimony must be excluded as unreliable under Daubert because she relies solely on facts that

plaintiff's counsel chose to share with her and did not conduct an independent review of evidence upon which her conclusions are based, and fails to use or describe any discernible methodology.

First, Dr. Bush's opinions are not sufficiently reliable because she did not conduct her own review of the evidence.  See E.E.O.C. v. Bloomberg L.P., 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010) ("Relying solely on the information fed to him by the [plaintiff] without independently verifying whether the information is representative undermines the reliability of [the expert's] analysis."); Rowe Entm't, Inc. v. William Morris Agency, Inc., 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003) ("[A]ny expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply.").  Dr. Bush's report relies upon a list of statements sent to her by plaintiff's counsel.  (Defs.' Mot. to Excl., Ex C).  And her deposition testimony revealed critical gaps in her knowledge of the facts as well as mistaken assumptions, reflecting her failure to verify the veracity and completeness of the facts supplied by plaintiff's counsel.

For example, Dr. Bush admitted she did not review key pieces of evidence, including plaintiff's personnel file or Bon Secours's policies.  (Bush Dep. at 165, 200, 203).  Moreover, Dr. Bush never spoke with plaintiff and appeared to be unaware that Edwards's sexual advances ceased after plaintiff complained about them.  (Bush Dep. at 197-98).  Most fundamentally, Dr. Bush testified she did not know who made the decision to terminate plaintiff, although her report concludes that decision was motivated by race and sex discrimination.  (Bush Dep. at 219-20). Dr. Bush cannot reliably conclude plaintiff's termination was motivated by racist and sexist animus without knowing who was involved in the decision to terminate her.  Because Dr. Bush

failed to conduct an independent review of the record, her report is replete with speculative arguments and her opinions are therefore unreliable.

Second, Dr. Bush's opinions are unreliable because her report does not explain the methodology she used to reach her opinions. "Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 157 (1999) (alteration omitted). An expert must provide an explanation of her methodology so its reliability can be evaluated. See Roniger v. McCall, 2000 WL 1191078, at *3 (S.D.N.Y. Aug. 22, 2000). For example, Dr. Bush does not explain the process by which she was able to conclude that Franco has "deep personal bigotry" about Caucasian women. (Dr. Bush Report ¶ 22). Without an explanation of her methodology, this conclusion appears to be a baseless regurgitation of plaintiff's argument.[6]

In opposing defendants' motion to exclude, plaintiff does not address the deficiencies in the reliability of Dr. Bush's proffered testimony. Instead, plaintiff merely argues the testimony should be admitted because it would be helpful to "explain the self-defense mechanism in women faced with male aggression." (Pl.'s Opp. at 23). This speaks only to the relevance of the testimony, not to its reliability.

Accordingly, the Hospital Defendants' motion to exclude Dr. Bush's proffered testimony is granted.[7]

---

[6]   Dr. Bush's report's lack of any discernible methodology is probably the result of the report being written by plaintiff's counsel. Dr. Bush left entire sections completely unchanged, word for word, from the initial draft plaintiff's counsel wrote. (Defs.' Mot. to Excl., Ex. C).

[7]   Having excluded Dr. Bush's testimony as unreliable under Daubert, the Court need not consider the Hospital Defendants' remaining arguments on this issue.

B.      Dr. Raghavan and Mr. Cucolo

The Hospital Defendants argue the proffered testimony of Dr. Raghavan and Mr. Cucolo should be excluded because plaintiff did not provide reports as required by Fed. R. Civ. P. 26(a)(2)(B).

The Court agrees.

Rule 26(a)(2)(B) requires the identification of expert witnesses to be accompanied by a report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them."  And Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Although the Rule makes exceptions for harmless nondisclosures, "the language of [Rule] 37(c)(1) is written in mandatory terms and is designed to provide a strong inducement for disclosure of Rule 26(a) material."  Hein v. Cuprum, S.A., De C.V., 53 F. App'x 134, 136 (2d Cir. 2002) (internal quotation omitted) (summary order).

The distinction between an expert under Rule 26(a)(2)(B), who must submit a written report, and an expert under Rule 26(a)(2)(C), who need only provide a summary of the expert's opinions, turns on whether the expert has been retained for the purpose of giving expert testimony.  See Bank of China, New York Branch v. NBM LLC, 359 F.3d 171, 182 n.13 (2d Cir. 2004) (collecting cases).  The distinction is not whether the expert is paid or is a volunteer, but whether the expert is brought into the case to testify.[8]  The rule "protects experts from preparing

_____

[8]      As an Advisory Note to Rule 26(a)(2) explains, "[a] treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."  Fed. R. Civ. P. 26, Advisory Committee's Notes, 1993 Amendment.

13

reports when they are not retained to do so and when it is outside the scope of their regular duties." Kent v. Katz, 2000 WL 33711516, at *1 (D. Vt. Aug. 9, 2000).

Here, plaintiff failed to submit reports for Dr. Raghavan and Mr. Cucolo by the deadline to do so. Plaintiff wrote that reports were not necessary because "[o]ne or all" of these experts "may be providing testimony on a voluntary, unpaid basis and not as an expert 'retained or specially employed to provide expert testimony.'" (Defs.' Mot. to Excl., Ex. A at 3) (quoting Rule 26(a)(2)(B)). Plaintiff argues these experts are not "retained" or "specially employed" under Rule 26(a)(2)(B) because they are unpaid. (Pl.'s Opp. at 22).

Plaintiff is wrong.

Rule 26(a)(2)(B) applies to Dr. Raghavan and Mr. Cucolo because plaintiff's counsel retained them for the purpose of providing expert testimony in this case, regardless of whether or how they were being paid.

The Court has considered the importance of Dr. Raghavan's and Mr. Cucolo's proffered testimony, as well as the prejudice to plaintiff in excluding the testimony, and finds both to be minimal. See Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (explaining that a district court has discretion to exclude testimony under Rule 37(c)(1) based on (i) plaintiff's explanation for the failure to comply with the disclosure requirement, (ii) the importance of the testimony, (iii) the prejudice to plaintiff, and (iv) the possibility of a continuance). Plaintiff failed to articulate why these experts are important or if any prejudice would flow from having these experts excluded, arguing only that their expertise is relevant. (Pl.'s Opp. at 22-23).

Thus, the proffered testimony of Dr. Raghavan and Mr. Cucolo is excluded. Fed. R. Civ. P. 37(c)(1).

III.   <u>Discrimination Claims</u>

Plaintiff's discrimination claims rest on her contention that Franco was biased in favor of "young Afro-American men," and this "infected the employer's decision-making." (Pl.'s Opp. at 1). Plaintiff argues she was treated unfairly by receiving the same discipline as Edwards, and her unfair treatment was the result of gender, race, ethnicity, national origin, and age discrimination. She brings discrimination claims covering these characteristics under Title VII, Section 1981, the Age Discrimination in Employment Act ("ADEA"), and the New York State Human Rights Law.

A.   <u>Applicable Standards</u>

1.   <u>Title VII</u>

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

2.   <u>Section 1981</u>

Section 1981 provides, in pertinent part: "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts." <u>Id</u>. § 1981(b). The statute "thus covers claims of discriminatory termination" based on race, such as plaintiff's claim in this case. <u>Lauture v. Int'l Bus. Mach. Corp.</u>, 216 F.3d 258, 261 (2d Cir. 2000).

3.      ADEA

The ADEA prohibits an employer from "discharg[ing] any individual or otherwise

discriminat[ing] against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's age."  29 U.S.C. § 623(a).  The statute's

protections are "limited to individuals who are at least 40 years of age."  Id. § 631.

4.      New York State Human Rights Law ("NYSHRL")

New York Executive Law Section 296 provides than an employer may not "refuse to hire

or employ or to bar or to discharge from employment such individual or to discriminate against

such individual in compensation or in terms, conditions or privileges of employment" because

of, among other characteristics, an individual's age, race, national origin, or sex.  N.Y. Exec.

Law § 296(1)(a).  Section 296(6) makes it "an unlawful discriminatory practice for any person to

aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to

attempt to do so."  N.Y. Exec. Law § 296(6).  Thus, even a co-worker who "lack[s] the authority

to either hire or fire the plaintiff" may still be held liable as an aider-abettor under NYSHRL

§ 296(6) if he "actually participates in the conduct giving rise to a discrimination claim."

Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004) (internal quotation marks omitted).

5.      Discrimination Claims Analyzed Under Similar Framework

Courts use similar standards to analyze employment discrimination claims under Title

VII, Section 1981, the ADEA, and New York Executive Law § 296.  See Turley v. ISG

Lackawanna, Inc., 774 F.3d 140, 151 n.6 (2d Cir. 2014) (Title VII and New York Human Rights

Law claims are governed by the same standards); Bucalo v. Shelter Island Union Free Sch. Dist.,

691 F.3d 119, 129 (2d Cir. 2012) (Title VII and ADEA governed by the same standard); Ruiz v.

Cty. of Rockland, 609 F.3d 486, 491 (2d Cir. 2010) (Title VII and Section 1981 claims analyzed

under the same standard).  The Court will therefore apply the McDonnell Douglas burden

shifting framework to all of plaintiff's discrimination claims.  See McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973).

Under the McDonnell Douglas framework, a plaintiff must establish a prima facie case of

discrimination by demonstrating "(i) membership in a protected class; (ii) qualifications for the

position; (iii) an adverse employment action; and (iv) circumstances surrounding that action

giving rise to an inference of discrimination."  Collins v. New York City Transit Auth., 305 F.3d

113, 118 (2d Cir. 2002).  At this initial stage, plaintiff's burden is "not onerous."  Norton v.

Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998).  After plaintiff establishes a prima facie case, the

burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse

employment action.  See United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011).  If the

employer meets that burden, "[t]he burden then shifts back to the plaintiff to show that [the

employer's] stated reason for the adverse employment action was in fact pretext."  Id.

(quotations and alterations omitted).

Putting aside whether plaintiff met her minimal burden at the prima facie stage, the Court

will "proceed directly to the third step of the McDonnell Douglas analysis and determine

whether [plaintiff] has produced evidence sufficient to permit a rational finder of fact to infer

that [the Hospital Defendants'] decision was more likely than not based in part on

discrimination."  Walsh v. New York City Hous. Auth., 2016 WL 3632245, at *3 (2d Cir. July 7,

2016) (quotations and alterations omitted).

The Court must examine the entire record "just as a jury would" to see if plaintiff could

persuade the trier of fact that the Hospital Defendants intentionally discriminated against

plaintiff.  Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001); see

<u>Walsh v. New York City Hous. Auth.</u>, 2016 WL 3632245, at *3 (2d Cir. July 7, 2016) ("A plaintiff's evidence at the third step of the <u>McDonnell Douglas</u> analysis must be viewed as a whole rather than in a piecemeal fashion.").  Taking each piece of evidence individually could lead a court to conclude there is insufficient evidence to permit a finding of discrimination, but when taken together, the evidence may be enough to support a jury finding of discrimination. <u>See</u> <u>Danzer v. Norden Sys., Inc.</u>, 151 F.3d 50, 57 (2d Cir. 1998).

     B.    <u>Legitimate, Non-Discriminatory Reason for Terminating Plaintiff</u>

The Hospital Defendants offer plaintiff's role in the fight with Edwards as the legitimate, nondiscriminatory reason upon which GSH's decision to terminate plaintiff was based:  Bon Secours's Director of Human Resources conducted an investigation, brought his findings to four other managers, and the managers concluded that plaintiff violated Bon Secours's policy prohibiting violence in the workplace.

Plaintiff argues summary judgment is not appropriate here because she received the same discipline as Edwards, even though she did not actually hit Edwards and violate the workplace policy against violence.[9]

It is, however, undisputed that Franco and the other managers believed plaintiff <u>did</u> hit Edwards and concluded plaintiff thereby violated the company's policy against workplace violence.  That Franco and the managers were wrong, without more, is irrelevant to the pretext analysis.  It is well-established that "[i]n a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff.  We are interested in what <u>motivated</u> the employer; the factual validity of the underlying imputation against the employee is not at issue."

---

[9]    For the purposes of this motion, the Court views the evidence in a light most favorable to plaintiff, and therefore assumes plaintiff did <u>not</u> hit Edwards.

McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (quotation marks omitted); see, e.g., Vasquez v. New York City Dep't of Educ., 2016 WL 3583219, at *1 (2d Cir. July 1, 2016) (plaintiff "takes issue with a number of the allegations levied against him; however, the veracity of these allegations is immaterial to the question of pretext") (summary order).

In short, the question is not whether Franco and the other managers were wrong about plaintiff hitting Edwards, but whether they had a good faith, non-discriminatory belief that plaintiff's conduct warranted termination under Bon Secours's policies.  To defeat summary judgment, plaintiff must produce some evidence – not mere speculation – undermining the Hospital Defendants' assertion that they reasonably believed plaintiff had violated Bon Secours policies, or some evidence of pretext revealing discriminatory intent.  See Oliveras v. Wilkins, 2012 WL 3245494, at *16 (S.D.N.Y. June 26, 2012), report and recommendation adopted, 2012 WL 3245493 (S.D.N.Y. Aug. 3, 2012) ("The [employer] was free to find [plaintiff's colleague] more credible than plaintiff, as long as it based its termination decision on its good-faith belief and not on plaintiff's gender.").

Plaintiff contends Franco's investigation was motivated by discriminatory animus, and therefore Franco did not have a good faith belief that plaintiff's conduct warranted termination. Plaintiff argues Franco's favoritism towards African American men tainted both his investigation and the managers' meeting in which the managers terminated plaintiff.  Plaintiff offers four arguments to show that the decision to terminate plaintiff had discriminatory intent.

None have merit.

1.      Franco's Handling of Plaintiff's February 2013 Complaint

First, plaintiff argues Franco's favoritism towards African American men is evidenced by Franco's response to plaintiff's complaint in February 2013.  Plaintiff's theory is that Franco's response was inadequate and reflects his bias against Caucasians, women, or Caucasian women.

Plaintiff argues Franco's response to her complaint was inadequate because "Mr. Franco accepted Mr. Edwards's defense that he did nothing wrong in February 2013, because Mr. Franco conducted no further investigation."  (Pl.'s Opp. at 11).  Plaintiff argues Franco "brushed her complaints aside" and instead "should have investigated [her] racial and sexual harassment complaints."  (Id. at 14).

This argument is belied by the unrefuted evidence.

After learning of plaintiff's complaint, Franco brought the issue to plaintiff's union delegate.  Then, Franco participated in a meeting with plaintiff, Edwards, and their union delegate, at which Edwards's alleged sexual advances and racial comment were discussed. During the meeting, both plaintiff and Edwards agreed they would continue working together.[10] Following that meeting, the uncontroverted evidence is that Edwards's sexual advances towards plaintiff completely stopped.  Plaintiff concedes she worked with Edwards without incident until June 2013.  In short, Franco did not simply brush plaintiff's complaints aside.

Even assuming, arguendo, that Franco should have taken a different course of action in response to plaintiff's complaint, no rational fact-finder could understand Franco's response as

---

[10]      Plaintiff argues she had no choice but to agree and Franco was "protecting" Edwards during this meeting.  (Pl.'s 56.1 Resp. ¶ 48).  Plaintiff points to (i) Franco's warning that any future incidents could result in Edwards being ineligible to be transferred out of the Dietary Department, and (ii) the fact that it was "irresponsible" for Franco to not escalate the issue to a supervisor.  (Pl.'s Opp at 14). The notion that Franco sought to protect Edwards is pure speculation, and could not be credited by a reasonable fact-finder.

evidence that the subsequent decision to terminate plaintiff's employment was based on race or gender discrimination.  See Anderson v. Hertz Corp., 507 F. Supp. 2d 320, 328 (S.D.N.Y. 2007), aff'd, 303 F. App'x 946 (2d Cir. 2008) (plaintiff's co-worker could have been fired for past racially-motivated remarks but was not, and court held "it is far too much of a stretch to take [the supervisor's earlier] nonaction and understand it to mean Defendant's decision to terminate Plaintiff's employment was based on racial discrimination; indeed, no rational finder of fact could draw such a conclusion").

Thus, a reasonable jury could not conclude Franco favored African American men over Caucasian women based in part on Franco's response to plaintiff's complaint in February 2013.

2. Underline People Influencing Decision to Terminate Were African American Males

In support of her race and gender discrimination claims, plaintiff also argues "[t]he people with the strongest influence over the decision to terminate her were all Afro-American males – her assailant (Mr. Edwards), his friend and the only witness to her beating (Mr. Jason), her union representative (Mr. Forde), and most importantly, the HR Director (Mr. Franco)." (Pl.'s Opp. at 10).

This argument is without any legal or factual support.

First, plaintiff has not cited a single authority – apart from "human nature" (Pl.'s Opp. at 11) – that a decision-maker's race or gender supports an inference of bias against another race or gender.  See Yusuf v. Vassar Coll., 35 F.3d 709, 714 (2d Cir. 1994) (Section 1981 complaint dismissed for failure to state a claim when the only allegation implicating race was that defendants were of a different race from plaintiff).

21

Second, of the people cited by plaintiff as "influenc[ing]" the decision to terminate plaintiff, the only one who had actual decision-making authority was Franco.[11]  The undisputed evidence shows that Franco was one of five management-level employees who made the decision to terminate plaintiff.  The other managers included two Caucasian women and one Asian American woman.

Thus, a reasonable jury could not conclude plaintiff was terminated based in part on the race or gender of the people who decided to terminate her.

        3.        Franco Told Managers Plaintiff was Accused of Racism

In support of her race discrimination claims, plaintiff argues "Franco specifically informed his decision-making colleagues that [plaintiff] was accused of being racially biased.  This is direct evidence of race discrimination."  (Pl.'s Opp. at 9).  This argument may refer to plaintiff's having received a written warning after calling a co-worker a "slave," or her February 2013 complaint that Edwards accused her of making a racist comment.

Either way, plaintiff's argument has no merit.

First, plaintiff has provided no legal authority for the notion that when a decision-maker recalls an employee's record invoking race, that fact is evidence of the decision-maker's own racism.  Even assuming Franco told his decision-making colleagues plaintiff was racist,[12] it

---

[11]     Edwards and Jason had "influence" only insofar as they were interviewed during the investigation of the fight, and that investigation resulted in plaintiff's termination.

[12]     The record is unclear whether Franco actually informed his decision-making colleagues about plaintiff's written reprimand for her "slave" remark or the conflict in February 2013.  Franco testified he told the managers that plaintiff was accused of being racially biased but his colleagues denied receiving that information.  Plaintiff alleges this is "dissembling" and is race discrimination against [plaintiff], on account of her being White."  (Pl.'s Opp. at 10).  For the purposes of this motion, the Court draws all reasonable inferences in favor of plaintiff and accepts it as true that Franco did inform the other managers about plaintiff's reprimand for

would be entirely speculative to find that Franco or the other managers' decision to terminate

plaintiff was motivated by racism.  See Nurse v. Lutheran Med. Ctr., 854 F. Supp. 2d 300, 311

n.3 (E.D.N.Y. 2012) (co-worker's comment that plaintiff was a racist "has no bearing on whether

plaintiff's adverse employment action was based on discrimination" in part because "to draw

such an inference would require a finder of fact to engage in wholesale – and wholly

impermissible – speculation") (internal quotation omitted).

Second, the managers met to reach a decision about how to discipline two employees and

in doing so, they sensibly and not surprisingly considered the employees' records.  There is no

evidence the managers' consideration of plaintiff's record was done with a discriminatory

animus or to mask their own discrimination.  See Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d

Cir. 2001) ("If, as plaintiffs contend, the defendants exaggerated or lied about plaintiffs'

behavior, the record does not support a finding that they did so to mask race discrimination.  No

comment or statement made by the defendants had any racial content or overtone.").

Thus, even if Franco told the other managers that plaintiff, in the past, was accused of

being racist, a reasonable fact finder could not conclude that plaintiff was terminated with

discriminatory intent.

4.      Plaintiff's Belief of Age Discrimination

In support of her age discrimination claim, plaintiff raises the following hypothetical:

"Simply put, a jury may conclude that if [plaintiff] were a beautiful young woman being sexually

harassed by a vile man, and then brutalized when she rebuffed his advances, then beaten for

trying to defend herself and prevent the abuse in the future, that she would never have been

---

calling a co-worker a "slave" and about the February 2013 conflict stemming from Edwards's
accusation that plaintiff made a racist comment.

terminated.  Thus, age was a cause of the termination."  (Pl.'s Br. at 21-22).  In other words, plaintiff believes that if she were young, she would not have been terminated.

This speculation is the entirety of plaintiff's argument with respect to age discrimination. It is unavailing and reflects the dearth of evidence that might support an inference of age discrimination.  See Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003) ("Purely conclusory allegations of discrimination, absent any concrete particulars, are insufficient.") (internal quotations and alteration omitted); Mann v. Donahoe, 2012 WL 32956, at *5 (D. Conn. Jan. 5, 2012) ("[Plaintiff's] own testimony that she 'believes' she was targeted based on her age among other factors, without more, does not support such an inference.").

5.    Viewing the Evidence as a Whole

As explained above, plaintiff's theories about Franco's or other managers' bias towards Caucasians or Caucasian women are either undermined by the uncontroverted evidence, or entirely speculative.  But even if a fact-finder were to credit plaintiff's unsupported conjecture, when considering the evidence as a whole, a reasonable jury would have to make an impossibly huge inferential leap to find that plaintiff's termination was motivated by race, gender, or age discrimination.

First, while it is true that if an employer reaches its decision through "bizarre or duplicitous process," there might be grounds for inferring pretext, nothing in this record supports the notion that Franco's investigation or the management-level meeting was duplicitous such that a reasonable jury could infer discriminatory motive.  McPherson v. New York City Dep't of Educ., 457 F.3d at 216 n.7.

There is simply no evidence in this case that Franco conducted a shoddy investigation or gave an inaccurate report to the other managers – either because of discriminatory animus or for

some other reason.  Franco interviewed each of the employees in the area at the time of the fight, conducted the interviews in the presence of another manager, and took several pages of notes. See Mendez-Nouel v. Gucci Am., Inc., 542 F. App'x 12, 14 (2d Cir. 2013) ("[A]lthough [plaintiff] argues that the investigation into the complaints lodged against him was in and of itself pretextual and that the complaints were untrue, the record shows that [the employer's] HR department took the investigation seriously, with copious notes memorializing conversations with other employees.").  Nor has plaintiff offered any evidence that the four other managers acted in bad faith in relying on Franco's investigation.  See Grillo v. New York City Transit Auth., 291 F.3d 231, 235 (2d Cir. 2002) ("Similarly, even if [plaintiff's manager and supervisor] may have exaggerated or lied about [plaintiff's poor performance], the record does not support a finding that they did so to mask any prohibited state of mind.") (quotation marks omitted); Uribe v. Kellogg's Snacks/Keebler, Inc., 2009 WL 1098369, at *7 (S.D.N.Y. Apr. 22, 2009) ("This conduct violated the Company's policies, and [plaintiff] has not explained why [company's Director of Labor Relations] was not entitled to rely on this evidence in deciding to terminate [plaintiff's] employment.").

Second, in viewing the evidence as a whole, a fact-finder would consider that plaintiff does not contend Franco ever made any comments driven by race, sex, or age animus, or that anyone at Bon Secours has a history of discrimination.  See Duviella v. JetBlue Airways, 353 F. App'x 476, 478 (2d Cir. 2009) ("Indeed, [plaintiff] has not identified any evidence indicating that the actions of either Julia Gomez, who investigated the harassment claims and recommended termination, or Barbara Shea, who made the ultimate termination decision, were motivated by [plaintiff's] age or race."); Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001) (plaintiff had not

"cited . . . any substantial evidence of gender bias, such as a decision-maker's gender-derogatory comments or documents").

Third, in viewing the evidence as a whole, a jury would consider that Edwards received the same discipline as plaintiff.  The fact that Franco and the other managers found both Edwards and plaintiff to have violated the policy against workplace violence, and terminated both, tends to undermine plaintiff's argument of discriminatory pretext.  Cf. Jeunes v. Potter, 382 F. App'x 2 n.2 (2d Cir. 2010) (affirming summary judgment in favor of employer on employee's Title VII claims when only plaintiff was fired for his role in an altercation and "[n]othing in the record . . . indicates that the [employer's] rejection of [plaintiff's] account was not in good faith, much less a pretext for discrimination.") (summary order).

In sum, the undisputed facts show that Franco investigated plaintiff's role in a fight, and five managers terminated her because they believed she violated the policy against workplace violence – irrespective of her race, ethnicity, national origin, gender, or age.  Because the Hospital Defendants made a showing that they fired plaintiff because they believed she violated the workplace policy, "it was incumbent upon plaintiff to present 'specific facts' – not conclusory allegations, speculation, surmise, or 'feelings' – to show the existence of genuine issues for trial."  Augugliaro v. Brooks Bros., 927 F. Supp. 741, 748 (S.D.N.Y. 1996).  Plaintiff has failed to do so.

Accordingly, the Hospital Defendants' motion for summary judgment is granted as to plaintiff's claims under Title VII (First Claim), Section 1981 (Second Claim), the ADEA (Third Claim, and the NYSHRL (Seventh Claim).[13]

---

[13]    Plaintiff's opposition conflates ethnicity with national origin (Pl.'s Opp. at 9), and does not point to any evidence to support either claim.  Those claims are dismissed.  See Jackson v. Fed. Exp., 766 F.3d 189, 196 (2d Cir. 2014).  Similarly, the Hospital Defendants moved for

IV.    Plaintiff's Retaliation Claim

Plaintiff also brings a retaliation claim under Title VII and 42 U.S.C. § 1981 (Fourth

Claim).  Title VII's anti-retaliation provision "forbids employer actions that 'discriminate

against' an employee (or job applicant) because he has 'opposed' a practice that Title VII

forbids." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C.

§ 2000e-3(a)).  "To establish a prima facie case of retaliation, an employee must show that (1)

she was engaged in protected activity; (2) the employer was aware of that activity; (3) the

employee suffered a materially adverse action; and (4) there was a causal connection between the

protected activity and that adverse action." Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir.

2012).[14]  However, a "plaintiff need not prove that her underlying complaint of discrimination

had merit." Id.

Plaintiff's retaliation claim is that plaintiff "complained of racial hostility and sexual

harassment" (Pl.'s Opp. at 20), and as a result, "defendant engaged in adverse treatment of

plaintiff, including permitting the continuance of a hostile work environment."  (Am. Compl.

¶ 150).[15]  However, as explained above, after plaintiff complained of harassment in February

---

[14]    Retaliation claims under Section 1981 are generally analyzed in the same manner as under Title VII.  See Acosta v. City of New York, 2012 WL 1506954 at *8 (S.D.N.Y. Apr. 26, 2012).

summary judgment on hostile work environment claims (within the First, Fourth, and Seventh Claims), negligence claims (Tenth Claim), and a claim under 42 U.S.C. § 1986 (Sixteenth Claim).  Apart from a conclusory assertion that plaintiff was constructively discharged (Pl.'s Opp. at 23-24), plaintiff did not respond to defendants' arguments that any of these claims should be dismissed.  Therefore, plaintiff has abandoned them and they are dismissed.  See Gaston v. City of New York, 851 F. Supp. 2d 780, 796 (S.D.N.Y. 2012) (deeming claims abandoned when plaintiff "failed to respond or even mention these claims in his opposition brief to defendants' summary judgment motion").

[15]    The Court cites to plaintiff's operative complaint because her opposition papers do not clearly identify what "materially adverse action" forms the basis of her retaliation claim.  Lore v. City of Syracuse, 670 F.3d at 157.  The Hospital Defendants' brief focuses on the five-month

2013, plaintiff admits that Edwards's sexual advances stopped and they continued to work together without incident until the fight.  And even if Franco did fail to respond to plaintiff's February 2013 complaint – which he did not – "the failure to investigate a complaint cannot be considered an adverse employment action taken in retaliation for the filing of that same complaint."  Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 722 n.8 (2d Cir. 2010).

If plaintiff's retaliation claim is premised on her termination, that claim fails for similar reasons as her discrimination claims; plaintiff "presented no evidence that [her termination] reflected anything other than [her employer's] enforcement of its preexisting disciplinary policies in a reasonable manner."  Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 26 (2d Cir. 2014) (internal quotations and alterations omitted).  No reasonable jury could conclude her termination "represented a departure from [Bon Secours's] normal disciplinary practices, such that they might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 68).

Accordingly, the Hospital Defendants' motion for summary judgment as to plaintiff's retaliation claim (Fourth Claim) is granted.

V.    Plaintiff's Remaining State Law Claims

In addition to state law employment discrimination claims against all defendants, plaintiff brings state law claims for battery (Eighth Claim), defamation (Ninth Claim), malicious prosecution (Eleventh Claim), and assault (Thirteenth Claim) against Edwards.

---

delay between February 2013 and her termination, reflecting their belief that plaintiff's termination was the adverse employment action.  The Court considers both bases for plaintiff's retaliation claim.

On September 23, 2015, the Court denied plaintiff's motion to dismiss her state law claims against Edwards and then-defendant Jason because (i) there was no basis at that stage of the case to decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367, and (ii) the "the values of judicial economy, convenience, fairness, and comity" supported the Court's exercise of supplemental jurisdiction.  Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y., 464 F.3d 255, 262 (2d Cir. 2006) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1998)).  (Doc. #143).

Now, having dismissed all of plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c). See Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 123 (2d Cir. 2006) ("[W]e can discern no extraordinary inconvenience or inequity occasioned by permitting the claims to be refiled in state court where they will be afforded a 'surer-footed reading of applicable law.'") (quoting United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966)).

**CONCLUSION**

Defendants' motions to exclude and for summary judgment are GRANTED.

The Clerk is instructed to terminate the motions.  (Docs. ##171, 173).

The Clerk is instructed to mail a copy of this Opinion and Order to pro se defendant

Charles Edwards.

The Clerk is instructed close this case.

Dated: August 5, 2016
       White Plains, NY

                    SO ORDERED:


                    _____
                    Vincent L. Briccetti
                    United States District Judge